JAMES DACEY

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

Filed at Ottawa March 25, 1886.

1. CONTINUANCE— of the affidavit therefor—credence to be given it—intendments against it. As a general rule, the statements of fact in an affidavit for a continuance, for the purpose of the application, must be taken as true; but where a party, in addition to his own affidavit, presents that of another person in support of his motion, he will give it the same credence as his own, and if the statements in the two are inconsistent, the court will not be required to hold both true.

2. If a showing in an affidavit for a continuance is equivocal or uncertain, the intendments must be taken against it, as it is presumed the party makes the best showing the facts will authorize.

3. SAME—want of preparation for trial—as a ground for postponement or continuance. Upon a showing, in a prosecution for murder, that for want of time counsel has not the case properly in hand, or that witnesses are not in attendance who might be found on further time being given, or that the cause is not ready for trial for want of opportunity for preparation, owing to any cause not the fault of the accused, the court, in the exercise of a wise discretion, should postpone the trial to a later day in the term, or continue the cause, if necessary.

4. SAME—abandonment by counsel. An affidavit for a continuance in a capital case, on the ground that the defendant's counsel, shortly before the term the cause was set for trial, abandoned the case, and want of sufficient time to properly prepare for the defence since the employment of other counsel, is wholly insufficient, if it fails to state that the counsel then defending are unable to fairly present the defence.

5. SAME—absence of witnesses. A continuance will not be granted upon the ground of the absence of witnesses, unless it is shown there is some necessity for the production of the proposed testimony. Hence, an affidavit for a continuance upon that ground, should show the party has no other witness by whom he can establish the same fact. A continuance will not be granted to enable a party to produce merely cumulative evidence, unless some reason therefor is shown, as, that there will be a conflict as to the proposed evidence.

6. An affidavit for a continuance in a criminal case showed the absence from the State of two witnesses, by whom the defendant expected to prove his partial and occasional fits of insanity or insane delusions, some seven years before, and before he came to this State, but failed to show that he

could not prove the same facts by other witnesses, and on the trial he did give evidence of those facts, which were not controverted: *Held*, no error in refusing a continuance on such ground.

7. If witnesses are produced and examined on defendant's behalf, who are named as being not found or present, that will obviate the showing for a continuance, so far as based on their non-attendance when the affidavit was filed.

8. An affidavit for a continuance on the ground of the absence of a non-resident witness not subject to the process of the court, must state, in addition to the party's belief of being able to procure his attendance at the next term, the grounds of such belief, so that the court may judge whether the party has a reasonable ground for such expectation, and without such showing the affidavit is fatally defective, in a criminal case.

9. It is the duty of a defendant in a criminal case to use such reasonable means as are within his power to prepare for trial at the first term after indictment found. If he has time to communicate with non-resident witnesses whose names and residences are known, before his case is called for trial, and learn whether or not he can procure their attendance at such time, he must do so, and failing to take steps to ascertain such fact or facts, he can not be said to have used due diligence in preparing for trial.

10. CRIMINAL LAW — *insanity as a defence—presumption of sanity—degree of proof to overcome the presumption*. On the trial of one for murder, where insanity was relied on as a defence, the court instructed the jury that the law presumed every man to be sane until the contrary was shown, and that when insanity is set up as a defence, before the accused could be acquitted on that ground it must appear, from the evidence, that at the time of the commission of the crime he was not of sound mind, but affected with insanity to such a degree as to create an uncontrollable impulse to do the act charged, by overriding his reason and judgment, etc.: *Held*, that the instruction stated the law correctly, and there was no error in giving the same.

11. The presumption of the sanity of one accused of crime, obtains and holds at and during every stage of the trial, until the same is overcome by evidence. This presumption, in this State, may be overcome by evidence tending to prove insanity, which is sufficient to raise a reasonable doubt of the sanity of the accused at the time of the commission of the act charged. When this is done, the presumption of sanity ceases, and the burden is shifted upon the prosecution to prove his sanity, as any other element necessary to constitute crime, beyond a reasonable doubt.

12. SAME—*of an instruction on that subject—construed*. An instruction in a criminal case, that before the jury can acquit on the ground of insanity, it must appear, from the evidence in the case, that at the time of the commission of the crime the accused was not of sound mind, but affected with insanity to such a degree as to create an uncontrollable impulse to do the act, etc., is not liable to the objection that it imposes on the defendant the burthen

of proving his insanity by a preponderance of the evidence. It does not state to what extent insanity must be made to appear,—whether beyond a reasonable doubt, by a preponderance of the evidence, or to an extent only sufficient to raise a reasonable doubt of sanity.

13. WITNESS—*credibility, as affected by his having testified falsely.* It is error to instruct the jury that if they believe, from the evidence, that any witness or witnesses have knowingly and intentionally sworn falsely in the case, they may wholly disregard such testimony. The jury have no right to disregard the testimony of a witness because he may have testified falsely to a matter wholly immaterial to any issue in the case.

14. FORM OF VERDICT—*instruction.* An instruction given on the trial of one for murder, as to the form of the verdict in case of a conviction, is not erroneous because of omitting to give a form of verdict in case of a conviction of manslaughter, especially where there is no evidence reducing the homicide to manslaughter.

15. ERROR *will not always reverse—giving improper instructions.* A judgment of conviction in a capital case will not be reversed for error which the court can see worked no injury to the defendant. So when the court erroneously instructed that the testimony of any witnesss who had testified falsely knowingly and intentionally, might be disregarded, leaving out of view its materiality, and it appeared that the only contradiction of any witness' testimony was upon facts material to the issues, it was *held*, the error could work no harm.

WRIT OF ERROR to the Circuit Court of McHenry county; the Hon. ISAAC G. WILSON, Judge, presiding.

Messrs. T. D. & E. D. MURPHY, for the plaintiff in error:

A continuance should have been granted under the circumstances shown, to enable the defendant to fairly present his case. For the purposes of the motion, the affidavits in support thereof must be taken as true. *Wray* v. *People,* 78 Ill. 212; *Conley* v. *People,* 80 id. 236.

By the People's third instruction the jury are told that in order to enable the defendant to avail of the defence of insanity, the fact of insanity must be established by a preponderance of the evidence. It is sufficient for the defendant to establish a defence, that he makes such a showing as to raise a reasonable doubt of his sanity. *Hopps* v. *People,* 31 Ill. 394; *Chase* v. *People,* 40 id. 352.

The court clearly erred in its fourth instruction as to the credibility of the witnesses, in omitting the requirement that the false testimony should relate to matters material to the issues.

The jury have no right arbitrarily to discredit the testimony of a witness, unless he has willfully and knowingly sworn falsely to some material facts in the case. *Evans* v. *Gray*, 80 Ill. 51; *Express Co.* v. *Hutchinson*, 58 id. 44; *Falk* v. *People*, 42 id. 331; *People* v. *Dodson*, 58 id. 365; *Otmer* v. *People*, 76 id. 149; *Pollard* v. *People*, 69 id. 152; *Reynolds* v. *Greenbaum*, 80 id. 416; *Gallagher* v. *People*, 82 id. 145; *Swan* v. *People*, 98 id. 610; *Pennsylvania Co.* v. *Conlan*, 101 id. 93.

The court, by instructing the jury as to the form of their verdict as to murder alone, withdrew from the jury the question of the defendant's guilt of manslaughter. It was his privilege to have the jury fix his punishment at less than the penalty for murder.

Mr. JULIUS S. GRINNELL, and Messrs. MILLS & INGHAM, for the People:

Notwithstanding there may be technical error in some part of the record, the evidence fully justified the verdict, and no prejudice has resulted to the defendant thereby. *Kennedy's case*, 40 Ill. 497; *Leach's case*, 53 id. 33.

While one accused of crime should have a reasonable opportunity to prepare his defence, he must show he has one, and his statement must be closely scrutinized. *Stubb's case*, 45 Ill. 152.

The affidavit for continuance is open to a fatal objection, as failing to set forth any facts to show that the attendance of the non-resident witnesses would ever be obtained. (*Perteet's case*, 70 Ill. 171; *Eubank's case*, 41 id. 416; *Wilhelm's case*, 72 id. 468.) Besides, there was ample time in which to have procured their attendance at the trial after the motion was overruled.

The court will not reverse for a technical error in the instructions, when, taken as a whole, they state the law fairly, and substantial justice has been done. *Wilson's case*, 94 Ill. 327; *Dunn's case*, 109 id. 646; *Ritzman's case*, 110 id. 363.

The third instruction complained of is taken *verbatim* from the *Hopp's case*, 31 Ill. 394.

The instruction, "then before the jury can acquit accused on the ground of insanity, it must appear, from the evidence in the case, that at the time of the commission of the crime the accused was not of sound mind," etc., puts no burden on the defendant not legally justified. The rule as to reasonable doubt need not be repeated in the several instructions. The instruction as to the form of the verdict is not erroneous in omitting to give a form for a conviction of manslaughter. The record shows the defendant was guilty of murder, or nothing. *Dunn's case*, 109 Ill. 646.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

The indictment in this case was returned into the Criminal Court of Cook county May 31, 1884. An arraignment of defendant was had June 13, following, and on the 23d of the same month a motion for change of venue was entered by defendant, and such proceedings were had that on the 5th of July, 1884, the venue of the cause was changed to McHenry county. The circuit court of McHenry county commenced the fourth Monday in September, and on the 24th of September, being one of the days of that term, the defendant entered his motion for continuance, supported by his own affidavit, and the affidavit of his brother, Patrick Dacey. On the same day this motion was overruled by the court, and on the 29th of September the defendant was put upon trial, which resulted, on the 3d of October, in a verdict of guilty of murder, and fixing the penalty at death. Motion for new trial by defendant was overruled by the court, and judgment entered on the verdict, sentencing the defendant to be hanged

by the sheriff of McHenry county, November 21, 1884. Exceptions were duly taken to the various rulings of the circuit court, and the defendant, James Dacey, prosecuted this writ of error to the circuit court of McHenry county, to reverse the judgment so entered.

The first error assigned is the overruling of the motion by defendant for a continuance. It will be unnecessary to quote the affidavits except so far as it relates to the two witnesses, Ellen and Michael Farrell, without whose evidence, it is alleged, the defendant could not safely proceed to trial. The other portions of the affidavit of plaintiff in error states, in substance, that plaintiff in error was arrested on the 13th day of May, 1884, and has since been in close confinement; that very soon after his arrest a lawyer of high standing and reputation was retained by friends of the accused to prepare and conduct his defence, and to whom large sums of money were paid; that he and his friends relied upon said attorney, who represented at various times that the case was being prepared; that he knew no better until the 24th day of August, 1884, when his case was abandoned by his attorney, who had failed to make any preparation thereof whatever; that he was refused permission by the jailor to communicate with his friends after the 24th of August, until about a week before his removal from the Cook county jail to McHenry county; that his attorneys then in charge of his case had been employed only a few days; that his only friends who were able to assist him resided in Buffalo, New York; "that as soon as he could, situated as he was, he communicated with and informed his friends in Buffalo, and as soon as they possibly could, they came on, reaching Woodstock last Saturday morning, when the present counsel was employed."

It is noticeable that nowhere in the affidavits filed is it, even inferentially stated that the counsel then defending were, because of their recent employment, or for other cause, unable to fairly present the defendant's case. The affidavits are

wholly silent upon that subject. And it will also be observed that there is no statement in the affidavits that there are persons who may have known the defendant during the years he resided in Chicago, from 1879 to A. D. 1884, whose names or residence were then unknown, or who had not been found,— that is, that farther time for preparation, if allowed, would enable the defence to produce a single witness who had known the defendant and his condition during the five years preceding the homicide, that they did not then know of and were able to produce. True, Patrick Dacey, in his affidavit, says, "he believes there are two respectable physicians in the city of Chicago who have, since defendant has been a resident of said Chicago, treated him, and know him to be an insane man, but whose names this affiant *is this moment unable to give*," but if permitted time, believes he can produce them. At "the moment" he was unable to give the names, but there is no statement that the names were unknown to the defence, or that they could not be produced at that term of court as well as at any subsequent one. Indeed, it is perfectly clear, from the record, that they were, in fact, in attendance on that court, and testified in the case. The testimony of Patrick Dacey, when on the stand, discloses that Dr. Bluthardt, county physician of Cook county, and his assistant, were the physicians who attended upon his brother James in Chicago, both of whom testified upon the trial of the cause. The defendant, in his affidavit, sets forth what he expects to prove by said Farrells, and says that their testimony, with such testimony as he is able to provide from Chicago and the scene of the tragedy, will satisfy any unprejudiced jury of his innocence. The names of Michael Leyden, John O'Brien, Benjamin Price, "and others," of Chicago, are given as such witnesses. As already said, there is no reason given or facts shown why he is not prepared for trial, so far as witnesses who had known him for the five years preceding the homicide, or so far as the ability of his counsel was concerned, or on

36—116 ILL.

account of any other matter, except the attendance of said witnesses Farrells, as he could ever hope to be.

Upon a showing that for want of time counsel did not have the cause properly in hand, or that witnesses were not in attendance who could be found if more time was given, or the cause was not ready for trial for want of opportunity for preparation, for any cause shown to exist, the court would undoubtedly, in the exercise of a wise discretion, have postponed the trial until a later day in the term, or until another term, if apparently necessary to do so, and such action would not have occasioned any just criticism. But it is insisted that this being the first application by defendant for continuance, and the defendant, as shown, having been abandoned by his counsel, and from the 24th of August until some time in September having been refused permission to communicate with his friends, upon consideration of these facts a continuance should have been granted. It is the right of every citizen, when indicted for an offence, to have a fair and impartial trial and compulsory process to compel the attendance of his witnesses, and that involves, as a matter of course, the time reasonably necessary to prepare for trial, and to find and produce testimony in his defence. It is not, however, a matter of which the defendant can complain, that the trial is speedy, or occurs at the first term, or however speedily after the alleged commission of the offence, if he has had time for preparation and is ready for his defence. The affidavit filed, as already seen, presented no facts which, in the exercise of reasonable discretion by the court, would have warranted a continuance of the cause, outside of the alleged absence of the witnesses Michael and Ellen Farrell.

We will next consider the application with reference to those two witnesses. The affidavit of defendant states, "that he expects to be able to prove by Michael Farrell and Ellen Farrell, of the city of Buffalo, New York, that he, this defendant, is a person of unsound and insane mind, and has

been for the ten years last past; that his abnormal mental condition at the time of said alleged murder was the prime cause of any act of his which is the foundation of the complaint by the People in (this) case; that he knows of no other witness or witnesses by whom he can prove such fact of insanity prior to his residence in Chicago, which has been for the last five years; that in order to establish his condition at the time of the alleged murder, as to sanity or insanity, it will be necessary to show his condition in prior years, which he can do only by procuring the attendance of said witnesses, Michael and Ellen Farrell, from Buffalo, aforesaid, which he believes he can do by the next term of this court, and that this application is not made for delay, but that justice may be done; * * * that he verily believes he can prove by said Michael Farrell and Ellen Farrell that for the ten years last past, he, this defendant, has been of unsound and insane mind, subject to insane delusions, and that uniformly, when under the influence of excitement, from any cause, his reason would leave him, and he would become the victim of all sorts of insane delusions; and by the aid of their testimony, with such testimony as he is able to provide from Chicago and the scene of the tragedy, which resulted in the alleged murder, he will be able to satisfy any unprejudiced jury of the fact of his insanity at the time of said homicide, and that in fact and in law he is not guilty in manner and form as charged in the indictment; that he expects to be able to prove by Michael Leyden, John O'Brien, Benjamin Price, and others, of Chicago, Illinois, who have known defendant since his residence (there,) such facts and circumstances as, when taken in connection with the testimony of said Michael Farrell and Ellen Farrell, of Buffalo, as aforesaid, will make a complete and legal defence against said indictment."

The defendant, in further support of his motion for continuance, filed the affidavit of his brother, Patrick Dacey, as

follows: That he is a brother of defendant, resides in Buffalo, and has taken a deep interest in his brother's fate; that soon after the alleged murder he was informed that Mr. Augustus Van Buren had been employed to defend his brother, and the preparation of the case confided to him, and that he was making every necessary preparation; that he knew no better until two weeks ago; that immediately after learning the course pursued by said attorney, he received an injury that prevented his traveling until within a week; that as soon as he could he came to Chicago, and reached Woodstock the evening of the 23d instant; "that he finds his brother's defence has been entirely neglected and unprepared, and that he can not safely proceed to trial at the present term of this court; that for ten years last prior to the year 1879, he, said defendant, and affiant, boarded at the same house in the city of Buffalo, New York; that during that time he, said defendant, was afflicted at certain periods, running through the whole time, from twice to three times a year, of being thoroughly insane and crazy, and when in these insane moods he was cross and dangerous; many times during that period this affiant attended him nights, and took care of him, and got him doctored and cured for the time being, the doctors claiming that the trouble was in his head, as this affiant has no doubt is the case; that Michael and Ellen Farrell, of Buffalo, are near relatives of said defendant, and know all about his mental malady better than any one else, and this affiant verily believes, if permitted to procure their attendance, the defendant can abundantly establish the fact of his insanity for the past fifteen years; and this affiant further states that, as he believes, there were two respectable physicians in the city of Chicago who have, since defendant has been a resident of said Chicago, treated him, and know him to be an insane man, but whose names this affiant is this moment unable to give, but as he verily believes, if permitted time to do so, he can find and produce them by the next term of this court;

this affiant expects and believes, if allowed time until the next term, he can prove enough by said Michael and Ellen Farrell, which, taken with such other testimony as he has got in Chicago, to make a good legal defence of said defendant, on the trial of said cause."

We have thus given all of the affidavit of Patrick Dacey filed in support of said motion, and all of the affidavit of the defendant in any way relating to or touching upon the materiality of the evidence of the Farrells or other witnesses, and of the reasons for expecting that they would be present at some future term of said court, and of the efforts that in fact were made by the defendant, or any one for him, to procure their attendance.

It is insisted by counsel that these affidavits must, for the purposes of the motion for continuance, be taken as absolutely true. As applied to these affidavits this is stating the rule too broadly. As a rule the statements of fact contained in the affidavits for continuance must, for the purposes of the motion, be taken as true; but here the defendant, by filing the affidavit of his brother, Patrick, gave it credit, and thereby authorized the court to give it the same credence as his own, and if the statements therein are inconsistent with that made by the defendant, the court was not bound to treat both as true. It is presumed that in making the showing for a continuance the defendant will make the strongest possible statement in his own favor that the facts will warrant; and so far as the showing made is equivocal or uncertain, the intendments must be taken against it. (*Steele* v. *The People*, 45 Ill. 155; *Slate* v. *Eisenmeyer*, 94 id. 96.) Here the defendant swears, in his affidavit, "that he knows of no other witness or witnesses by whom he can prove such fact of insanity prior to his residence in Chicago," except said Farrells; and again, that he can only show his condition in such prior years by procuring the attendance of said Michael and Ellen Farrell, and at the same time he files the affidavit of the man who

boarded in the same house with him for ten years prior to his coming to Chicago, who tended on him during the nights and days, and who swears to his insanity at intervals during the entire period covered by the proposed evidence of the absent witnesses. Who would be so well qualified to testify to his condition during the ten years prior to 1879, as the man who had lived in the same house with him continuously for the whole of that period, who had watched with him at night, and tended, nursed and restrained him in his violence, called the doctors, listened to their diagnosis, and was enabled to testify to them? There is no pretence that the Farrells have known anything of the defendant's mental condition since his coming to Chicago, in 1879. Patrick Dacey, whose affidavit was filed by defendant, sworn to on the same day as his own, was in actual attendance on the court when the motion was pending, and competent to testify in defendant's behalf, and no reason is given or attempted to be shown in the affidavit why his testimony would not be competent and sufficient to prove every fact sought to be proved by the Farrells.

Continuances ought always to be granted when, from the showing, justice requires it to be done, and to enable a defendant to procure all legal and competent evidence necessary for the fair presentation of his case, if he has used due diligence to obtain the same. These technical objections should not ordinarily prevent the granting of the motion for continuance, if it is necessary to the proper presentation of the defendant's case. But continuances will not be granted unless it is shown that there is some necessity for the production of the proposed testimony. Hence, in affidavits for a continuance, it is the uniform practice for the party applying for the continuance, to state that he has no other witness by whom he can establish the same fact. Continuances will not be allowed to enable the party to produce evidence that is merely cumulative, unless there is some necessity shown therefor,—such as, that there will be a conflict in the evi-

dence in reference to the particular matter in regard to which the absent witness is expected to testify. (*Shook* v. *Thomas*, 21 Ill. 87.) Here the testimony of the Farrells, if produced, would be cumulative, merely, to testimony of Patrick Dacey, and there is no statement that there was any apprehended conflict in the testimony as to the mental condition of the defendant prior to his coming to Chicago, in 1879, or other reason stated why there would be any necessity for testimony additional to that already affirmatively shown by the affidavits to be in the power of the defendant to produce at the trial. As a matter of fact there was no conflict in the evidence as to the mental *status* of the defendant prior to A. D. 1879, and while he resided in Buffalo, which covered the whole time in which his insanity was sought to be shown by the Farrells. It might, and undoubtedly would, be much more satisfactory to prove the fact of his insanity in prior years by a number of witnesses; but insanity is a fact to be proved as any other fact, and if it became, or was thought to be, material to accumulate testimony as to that matter, it could readily have been shown by the affidavits. From the affidavits the court could not say that there would be any attempt to prove his sanity at any time, or that any conflict would arise upon that subject at any time in the life of the accused, either before or after he came to Chicago.

Again, these affidavits were fatally defective under the rule announced by this court in *Eubanks* v. *The People*, 41 Ill. 487, *Perteet* v. *The People*, 70 id. 171, and *Wilhelm* v. *The People*, 72 id. 468. The affidavits state that he expects to prove, etc., by the Farrells, at the next term of the circuit court, and that he believes he can procure their attendance at such next term of said court, but they wholly fail to show or set forth the grounds of such belief or expectation. The object of granting the continuance is, that justice may be done by permitting the defendant to procure his testimony, and unless the witnesses could be produced at the time to

which the cause was continued, the continuance would result in delay in the administration of the law, and subserve no good end. In *Eubanks case, supra,* it was said by this court, in passing upon the sufficiency of an affidavit for continuance in that case : "Nor does it (the affidavit for continuance) state when, if ever, these persons expected to return to this State, or that he (the defendant) had any expectation or information on the subject. Had the witnesses been residents of the State, and amenable to the process of the court, that statement would, no doubt, have been sufficient, (that he expected to procure the testimony by the next term, etc.,) as the court could then have seen how the testimony could have been procured at the next term ; but it is otherwise when a witness is beyond the limits of the State, and in such cases the party applying for a continuance should state the grounds of his expectation, so that the court may determine whether it is reasonable, and when stated, if it seems probable that the evidence can be obtained, and if material, the motion should be allowed. But if, when the grounds of the expectation are disclosed, it appears there is no reasonable probability that the attendance of the witnesses can be had, the motion should be refused." In the case of *Wilhelm* v. *The People,* cited, the court held that as the absent witness was a non-resident of the State, it was indispenable that the grounds of the expectation of the attendance of the witness should be set forth in the affidavit for continuance. And so in the case of *Perteet* v. *The People,* the court say : "No sufficient facts are set out in the affidavit by which the court could see that the evidence of Harvey would ever be obtained, which is necessary, in a criminal case, when the witness is out of the State, and can not be reached by the process of the court."

The rule announced that where the witness is a non-resident, the statement of the grounds of the expectation or belief of his attendance at a future term of the court is necessary and indispensable to the sufficiency of an affidavit for con-

tinuance on account of the absence of such witness, in a criminal case, is reasonable, and tends to promote the proper and efficient administration of the criminal laws.

Again, while no considerable degree of diligence could be required of the defendant under the circumstances shown by these affidavits, yet a defendant is required at all times to use due diligence to prepare his cause for trial. Taking the affidavits the most strongly in favor of the defendant, it appears that a week before his removal to McHenry county he was at perfect liberty to communicate with his friends, and did so. He was removed from the Cook county jail to Woodstock, the county seat of McHenry county, on the 19th of September, so that from the 12th day of September until the 24th, when the affidavit was filed, he could have communicated with the witnesses Ellen and Michael Farrell, and procured their attendance at the September term, 1884, if they were willing to attend. There is no pretence that he did this, or did anything toward endeavoring to secure their testimony. No reason is shown why they could not or would not attend at that term if they had been so requested, or why they would not as readily attend then as at any subsequent time. When a party desires the testimony of a witness who is a non-resident of the State, and therefore not amenable to the process of the courts, he can not rely upon such non-residence of his witness as a cause for continuance, unless he has used such reasonable means as are within his power in the time elapsing, to procure the testimony. If there is time within which to do so, and the residence is known, it is his duty to ascertain if the attendance of the witness can be procured at the first term of the court, and failing to do so, he can not be held to have used due diligence. Here twelve days intervened after all restrictions were removed from defendant's communication with his friends, before the affidavits for continuance were filed, and no request to these absent witnesses is shown. It is shown that they were "near relatives of the

defendant," and no reason is shown why they could not attend at that time. The presumption is just as strong that they would, if asked to do so, have attended at the September term of that court, as at any succeeding term. After the motion for continuance was overruled, five full days elapsed before the trial commenced, and eight days before the case went to the jury,—ample time to have secured the attendance of these witnesses. Two days, at most, would be all that would be required to enable them to reach the place of trial, if they were willing to attend, and no unwillingness on their part is suggested, nor any request made for them to do so, shown. We are of opinion that it was not error for the circuit court to overrule the motion for continuance.

It is also insisted that the court erred in giving the third, fourth and fifth instructions given at the instance of the People. So much of the People's third instruction as will be necessary to show the criticism upon it, is as follows:

"The court instructs the jury, as a matter of law, that the law presumes every man to be sane until the contrary is shown, and when insanity is set up as a defence by a person accused of crime, then, before the jury can acquit the accused on the ground of insanity, it must appear, from the evidence in the case, that at the time of the commission of the crime the accused was not of sound mind, but affected with insanity to such a degree as to create an uncontrollable impulse to do the act charged, by overriding his reason and judgment," etc.

It is obvious that the purpose of this instruction was to define and give to the jury the legal rule as to that degree of insanity which would relieve the defendant from criminal responsibility. It was the duty of the court to define and prescribe the rule by which the jury must be governed in determining whether the defendant was accountable, under the law, criminally, or not. No criticism is made of this instruction in the respect indicated, or that it does not prescribe the proper rule to be applied by the jury in determin-

ing whether the defendant, at the time of the commission of the alleged criminal act, was afflicted with that insanity which would, under the law, shield him from legal accountability and punishment. Nor will it be necessary to discuss, here, the law relating to this important and interesting subject. It is sufficient to say that the instruction in that respect is in entire harmony with the rule announced by this court in *Hopps* v. *The People*, 31 Ill. 391, and *Chase* v. *The People*, 40 id. 352. We regard the principles adopted as wise, humane and reasonable, protecting alike, as best can be done with our imperfect knowledge of mental diseases, the great interests of society and this most unfortunate class of persons when arraigned for the commission of crime.

It is objected, however, to this instruction, that by it the jury are told that before they can acquit on the ground of insanity, it must appear, from the evidence in the case, that the defendant, at the time of the homicide, was not of sound mind, etc., and that thereby was imposed upon the defendant the burden of proving his insanity by a preponderance of the evidence. We do not so understand the instruction. Soundness of mind is presumed if the defendant "is not an idiot, lunatic, nor affected with insanity." The first proposition of the instruction, "that the law presumes every man to be sane until the contrary is shown," is fundamental, and unquestioned as being a sound proposition of law. This instruction defined the mental condition which will be held to exculpate the party charged, from punishment for an act which would otherwise be criminal, and told the jury that such condition must appear from the evidence before they would be warranted in acquitting for that reason. To what extent it must appear is not stated,—whether beyond a reasonable doubt, by a preponderance of the evidence, or to an extent, only, sufficient to raise a reasonable doubt of sanity, the instruction does not assume to determine. The presumption of sanity inheres at every stage of the trial until insanity is made

to appear by the evidence. The law in this State undoubtedly is, that this legal presumption may be overcome by evidence tending to prove insanity of the accused, which is sufficient to raise a reasonable doubt of his sanity at the time of the commission of the act for which he is sought to be held accountable. When that is done, the presumption of sanity ceases, and the burden shifts to the prosecution, and it is then required to prove his sanity, as an element necessary to constitute crime, beyond a reasonable doubt. It is accurate to say that when the defence of insanity is interposed, and evidence offered tending to sustain it, if the jury, after considering all of the evidence, entertain a reasonable doubt of the sanity of the accused at the time of the commission of the alleged offence, he must be acquitted. It is found, in practice, impossible, however, to embody in a single instruction every principle of law relating to the subject under consideration, and it is not necessary that the law in regard to the measure of proof required should be incorporated in each instruction. It will be sufficient if there is nothing in the particular instruction inconsistent with the principle pertaining thereto, and other instructions in the series given correctly announce the rule. In this case the jury were fully instructed as to their duty to acquit if they entertained a reasonable doubt of the defendant's guilt.

In the second instruction on behalf of the People the rule of law upon this subject was given, and by the third instruction for the defendant the jury were told:

"The jury are further instructed that mere probabilities are not sufficient to warrant a conviction; nor is it sufficient that the great weight or preponderance of the evidence supports the allegations of the indictment; nor is it sufficient that upon the doctrine of chances it is more probable that the defendant is guilty than innocent. To warrant a conviction of the defendant, he must be proved to be guilty so clearly and conclusively that there is no reasonable theory

upon which he can be innocent when all the evidence in the case is considered together, and if the prosecution has failed to make such proof, the jury should find the defendant not guilty."

The second, third, fifth and sixth instructions for the defendant fully laid down and elaborately stated the law in regard to the presumption of innocence of the accused, and stated the rule fully and broadly that the jury must acquit if they entertained any reasonable doubt of his guilt. The seventh, eighth, tenth and twelfth instructions given at his instance were as follows:

"That it is true the law presumes every man to be sane and responsible for his acts until the contrary appears from evidence. Still, if there is evidence in the case tending to rebut the presumption, sufficient to raise a reasonable doubt upon the issue of sanity, then the jury will find the prisoner not guilty.

"That to warrant a conviction in this case it is incumbent on the People to establish, by evidence, to the satisfaction of the jury, beyond all reasonable doubt, the existence of every element necessary to constitute the crime charged. And if, after a careful and impartial examination of all the evidence in the case bearing upon the question of sanity or insanity, the jury entertain any reasonable doubt of the sanity of the defendant at the time of the alleged offence, they should give the defendant the benefit of that doubt, and acquit him.

"The jury are further instructed, as a matter of law, in this case, that if, from a careful consideration of the facts and circumstances shown in this case by the evidence, you believe that the defendant, Dacey, was insane and of unsound mind on the 13th day of May last, as late as twelve o'clock on that day, or thereabouts, then the presumption of law is, that that condition of mind continued up until after the shooting, between ten and eleven o'clock of that evening, as complained of in the indictment, unless you shall further believe, from

the evidence in the case, beyond all reasonable doubt, that he recovered from such insane condition of mind prior to said shooting.

"The court instructs the jury, as a matter of law in this case, that in all criminal cases, before conviction can be had, the jury must be satisfied, from the evidence, beyond a reasonable doubt, that the defendant is guilty in manner and form as charged in the indictment; and in order to sustain the defence of insanity it is not necessary that the insanity of the accused be established by a preponderance of evidence. If, upon the whole evidence, they entertain a reasonable doubt as to the sanity of the accused, they must give him the benefit of such doubt, and acquit him."

It is apparent that the general doctrine was fully stated, while by the seventh, eighth and twelfth instructions the attention of the jury was specially called to the issue of insanity, and the law stated as favorably for the defendant as he could possibly require it to be given. By the seventh they are expressly told that if there is evidence in the case tending to rebut the legal presumption of sanity, sufficient to raise a reasonable doubt upon that issue, then they should find the defendant not guilty. And so, also, by the twelfth, they are instructed that it was not necessary that insanity of the accused be established by a preponderance of the evidence, but if, upon the whole evidence, they entertain a reasonable doubt as to his sanity, they should acquit. These instructions were perfectly consistent with the People's third instruction, and when considered with it, announced the correct rule of law, and the jury could not have been misled to the prejudice of the defendant.

The fourth instruction for the People is as to the form of the verdict, and omitted to give the jury the form of verdict if for manslaughter. This, it is insisted, was erroneous, and was, in effect, denying the defendant the right of having his guilt of that offence, only, considered by the jury. This

position is not tenable. This question was before this court in *Dunn* v. *The People,* 109 Ill. 646, and it was there held that if it was desired by the defendant that an instruction of the form of verdict for the lesser offence should be given, it was his duty to prepare and ask such an instruction, and failing to avail himself of that right, he was in no position to complain. It is not suggested by counsel, nor can it be seriously contended, that there are in this case any of the elements which, under the statute, would reduce the unlawful killing to manslaughter. The evidence fails to show any such provocation as is required by law to reduce the crime from murder, nor is there evidence of that sudden impulse of passion, supposed to be irresistible, which will extenuate the unlawful killing. To reduce the homicide from murder to manslaughter, there must be both provocation and passion. The instruction given was proper, and is not obnoxious to the objection made; but if it was, the ninth instruction given at the instance of defendant, gave the jury correctly the punishment fixed by law to be inflicted for manslaughter, and if he or his counsel deemed it important, it was their privilege to ask of the court an instruction as to the form of verdict for that offence, and failing to do so, can not now be heard to complain.

The fifth instruction given at the instance of the People is wholly indefensible. After instructing the jury that it was their duty to consider all of the evidence in the case, it proceeds: "But if the jury believe that any witness or witnesses have knowingly and intentionally sworn falsely in the case, the jury are at liberty to disregard the testimony of such witness or witnesses, except so far as their testimony may have been corroborated by other credible evidence in the case," wholly ignoring the principle that such knowingly false testimony must have been to matters material to the issue. We do not hesitate to condemn this instruction. The jury have no right to disregard the evidence of a witness because he

may have testified falsely to a matter wholly immaterial to any issue in the case, and this is so well understood that it will not require the citation of authority. If the defendant may have been prejudiced by the erroneous instruction given, it will necessitate the reversal of the judgment against him. It will therefore become necessary to examine the case as it went to the jury, to determine whether the defendant could be prejudiced by the instruction complained of.

Counsel for plaintiff in error criticize the trial court for looking into the facts, on motion for a new trial, and determining that there was no such error, upon consideration of the whole case, as would entitle the plaintiff in error to a new trial. It is said the court in so doing usurped the functions of the jury, and thereby in effect tried the defendant without the intervention of a jury. The position assumed by counsel is, that if error is found in the instructions, the judgment must then be reversed, whether such error operates to the prejudice of the defendant or not. Such is not the law. In many cases determined by this court, the contrary doctrine is announced. In *Kennedy* v. *The People*, 40 Ill. 497, it is said: "This court has often held, when a series of instructions embrace the law of the case when taken and considered together, though one of them may be erroneous, still, for such error a judgment will not be reversed, provided it shall appear from the whole record that substantial justice has been done, and no prejudice has resulted by reason of such erroneous instruction, and that the law of the case has been given fully to the jury." In *Leach* v. *The People*, 53 Ill. 311, the court said: "The instructions were quite voluminous, and that a court, in disposing of them in the hurry of a trial, should commit some errors, is not remarkable. Some given by the court perhaps ought not to have been given, and some refused should have been given; but in all the important legal propositions bearing on the facts proved, we think full justice was done the prisoner. The instructions given on behalf of the

prisoner were as favorable as he had any right to demand, and no court is justified in reversing a judgment, if, on the whole record, it appears justice has been done, and there appears no substantial misdirection of the court by which the prisoner's rights were injuriously affected." In *Wilson* v. *The People*, 94 Ill. 327, it is said: "Objection is urged to the giving and refusing of instructions. Without saying there was not any error in that regard, we are contented that, as a whole, the case was fairly given to the jury. Where the result reached by a judgment is clearly right, it will never be reversed for errors which do not affect the substantial merits of the case." In *Dunn* v. *The People*, 109 Ill. 646, it is held: "While we do not hesitate to condemn the instruction, still we do not think it did any harm in this case, for the reason that the evidence did not leave the guilt of the defendant in doubt. The guilt of the defendant was so clear and palpable from the evidence, that no question of doubt could arise, and while the instruction was erroneous, the error could work no injury in the case." In *Ritzman* v. *The People*, 110 Ill. 363, it was held that "it is sufficient if the instructions, taken as a whole, substantially present the law of the case fairly. The criminal laws of this State must be enforced, and if it is not already understood, it is high time it should be, that where a case is clearly made out against the accused, and the jury have so found, this court will not reverse for a mere technical error, which it can see could not have affected the result."

Numerous other cases of like tenor might be cited, but these will suffice to show the unvarying rule of law in this State.

Every citizen, when charged with crime, is entitled to a fair and impartial trial, according to the due and orderly course of the law. Every principle of the law applicable to his case he may demand shall be given to the jury, and that nothing shall be given on behalf of the People that may unduly prejudice his cause. This, every man, whether guilty or

37—116 ILL.

innocent, may require, and more he can not lawfully demand. The law, for wise purposes, throws around a defendant every safeguard, and he may invoke, in his behalf, its protection, and when arraigned may require that the rules of the law be strictly applied to his case, and that nothing the 'law does not authorize and warrant, shall be done to his injury; but he can not be heard to complain if an error is committed that can not operate to his prejudice. Absolute correctness of proceeding can not be attained, even in our very best courts, and the establishment of any other rule would render the administration of the criminal laws practically impossible. When the defendant has had the benefit of a fair trial by an impartial jury, selected conformable to law, fully and fairly instructed in every principle applicable, with no rulings against him that would tend wrongfully to his inculpation or deprive him of his defence, he has received all that any citizen can rightfully demand of society. Such a trial, we think, was accorded to the plaintiff in error in the case at bar.

The importance of the case in its results has demanded, and it has received at our hands, the most careful examination of the record. The killing of Michael Gaynor on the 13th of May, 1884, is not denied. That it was done without any attending circumstances that furnish any palliation, justification or excuse for the crime, is, we think, fully established by the evidence. The court below gave at great length instructions as to the quantum and measure of proof required to convict and to overcome the defence of insanity interposed by the defendant. Instructions were given as to the presumptions of the law arising out of the facts relied on by defendant as to the inferences to be drawn from the motive of the defendant, or the absence or the want of it, and, indeed, with great ingenuity presenting every principle of law, so far as we can see, that could be applicable to any and every phase of the defence interposed. No complaint is made

by counsel in that regard, and it will be unnecessary to make further investigation in that direction.

It is believed that the most careful examination of the evidence will fail to disclose any witness for defendant to whom the jury could have applied the rule announced in this instruction under consideration, except the witnesses Patrick Dacey and Mrs. O'Neil. There is, we think, no circumstance testified to by any other witness, material or immaterial, that was contradicted. True, other witnesses testified as to their opinion of the mental condition of the prisoner, as hereinafter noticed, but there are no controverted points in their evidence save upon that question. The witness Mrs. O'Neill testified that the accused was at her house in the afternoon of the day of the homicide, at the time certain of the witnesses had testified to his having been upon the streets at some distance from her house, making threats against the deceased. It will be apparent that this was material evidence, and if they believed she testified willfully falsely thereto, the jury would, under the law, be justified in discrediting her testimony except so far as corroborated. The witness Patrick Dacey testified to the mental condition of his brother, the accused, on two occasions, when Dr. Bluthardt was called to see him in jail, prior to the trial. In so far as he was contradicted, if contradicted at all, by the witness Bluthardt and others, as to the condition of his brother on these occasions, it was material upon the issue of insanity, and hence if the jury believed, from the evidence, that he had sworn willfully falsely in respect thereto, they would be justified in rejecting his testimony, except so far as corroborated. So as to each instance when there was evidence contradictory, so far as we can see it was upon some matter material in the case, and therefore, although the jury may have applied the principle announced in the instruction under consideration, it put the accused in no worse position, nor operated to his prejudice to any greater extent, than it would if it had announced the correct rule of law.

But aside from this view, the plaintiff in error could not have been unduly prejudiced by this instruction, upon the case made and submitted to the jury. It will be remembered that the plaintiff in error brings this case to this court, and insists that error has intervened to his prejudice, and we are called upon to determine that matter from the whole record. If, as already seen, upon the whole record it clearly and conclusively appears that the giving of the instructions, or any of them, could not have produced the result of the trial, but that whether given or not the result must have been the same, it will follow that no reversal can be had.

The facts leading up to and immediately surrounding the killing of Michael Gaynor are not disputed, and are briefly as follows: On the 13th day of May, 1884, there was an election for alderman of the Ninth ward in the city of Chicago. Some weeks prior thereto the primaries or ward caucuses were held, and about the time of the primaries the prisoner, it appears, was arrested and fined, which, for some reason not disclosed, he attributed to Gaynor, and one Bowler, sergeant of the police. Shortly after that time he is shown to have entered a saloon, and calling for a drink, said: "I'm going down to square that fine. * * * I am going to kill Bowler on sight, and Gaynor, too." At the election mentioned, Mahoney and Murry were candidates, Gaynor supporting the former, and the defendant, Dacey, the latter. Some two weeks prior to the election, two witnesses testify that they advised the accused to give up the contest and go away, and he replied: "I am not going to live long, and I will take Bowler or Gaynor with me." The night before the election the accused purchased a revolver, alleging that he was to act as one of the challengers on the next day. On the morning of the election, being the 13th of May, a witness testifies that he saw the defendant, Dacey, at the corner of Washington and Clinton streets, and Dacey then "swore by the eternal God he would kill Gaynor before he would sleep that night." Some time

after the election opened, the judges of election refused to permit Dacey to remain inside where they were, as one of the challengers, and he was put out. About ten o'clock, Murry, whom defendant, Dacey, supported, was withdrawn from the canvass. It is shown that this angered defendant, Dacey, greatly. Three witnesses testify that about half-past ten o'clock he said to the deceased, in substance, that his man Murry was out of the field, and said, "Mike, you have downed me this time, but you'll never do it again." In the afternoon, between one and four o'clock, as testified to, he got into conversation with a witness, when the witness expressed sorrow that he had been arrested and fined, whereupon defendant replied, "That's nothing—I will get even;" then exhibiting the handle of a revolver, said, "Do you see that? I'll knock Bowler or Gaynor out with this." Another witness testifies that "on Halsted street, just before the murder, he said he was going to shoot either Bowler or Gaynor that night."

We can not state in detail the conversations leading up to and circumstances surrounding the defendant at the time of these declarations. It is apparent, however, that the animosity engendered by his arrest, for which he held Gaynor accountable, was intensified by the subsequent events alluded to, and these threats were the deliberate expression of intense hatred and ill-will toward the deceased. Between ten and eleven o'clock on that night, Michael Gaynor and the witness McIntyre entered a saloon on Halsted street, in which defendant, Dacey, was sitting. Those present were asked to the bar by Gaynor, and Dacey came forward, approaching Gaynor, and said: "You have been fighting me for two years; will you shake hands now?" McIntyre interfered, and offered to bet Dacey $20 that Gaynor would not shake hands with him. Dacey had extended his hand, but Gaynor, apparently not noticing it, smilingly turned away from him, and to the bar, took up his glass, and said: "Never mind, Jim, let us have a fresh one." Without a word of warning,

and standing nearly behind and only a few feet away, the defendant drew his revolver and fired a ball into the brain of Michael Gaynor, the shot taking effect in the back part of the head and ranging forward. Gaynor fell to the floor, and those present secured the defendant. Upon having done so, on examination of the prostrate Gaynor it was found that he was unconscious, though life was not extinct, and he was at once removed to his home, where he lingered until the 24th day of May, 1884, and died from the wound thus inflicted. Whilst the defendant was being taken to the police station, immediately after the shooting, he was asked why he did it, and replied to the officer, "I did it on account of a little political difficulty." The facts immediately connected with the killing of Michael Gaynor are testified to by at least three witnesses, none of whom are discredited, and who give the same account, in all essential particulars, of the homicide, and its attendant circumstances.

The events culminating in his death are clearly shown, and evince, beyond question, as we think, that the plaintiff in error was actuated by malice, and that nothing is shown or appears to extenuate, justify or excuse his wicked act. It matters not whether his grievance was real or imaginary, or whether he desired to shake hands, or only extended his hand to provoke a quarrel. The evidence shows that the shooting of the deceased was premeditated, and prompted by a cruel and wicked desire for revenge.

Heretofore we have not considered the evidence bearing upon and tending to sustain or rebut the defence of insanity interposed, but a very brief analysis of the testimony offered for and by the defendant will demonstrate, we think, the correctness of the view expressed.

The defendant had lived in Chicago five years immediately preceding the homicide, had held a position in the "county house," had been connected with ward politics; was a member of one of the labor unions, and is shown in other ways to

have known many people in that city. He was tried in an adjacent county, whither his case had been transferred at his instance, and within an hour or two, by railway, of his acquaintances and friends. After his motion for a continuance had been overruled, before any steps had been taken, the cause was delayed nearly a week before commencing the trial, and several days additional elapsed before he was required to put in his evidence. There is no complaint in the affidavit for continuance that all the witnesses from Chicago could not be procured that could be had if more time was allowed, nor was any such complaint made in or to the circuit court, except that it was asked to await the arrival of a train, which was immediately done,—the court adjourning over for that purpose,—nor is any such complaint made or suggested here. The defendant, by his counsel, called seven witnesses upon that issue,—Dr. Joseph Krosh, Dr. Thomas Waugh, James Bonfield, William O'Neil, Sarah O'Neil, Thomas Powers and Patrick Dacey. Of these witnesses Dr. Krosh, who had attended him from the time of his arrest, with every opportunity for observation and examination, testified that he visited the defendant as often as three times a week during his confinement in jail, and at no time saw anything to induce him to think or believe the defendant's mental condition was anything but normal, and he found him in a normal mental condition.

Dr. Waugh had met the defendant prior to May 13, 1884, and again met him that day, about noon, and invited him into a saloon to take a drink. While there, a man by the name of McIntyre came in, and witness, apprehending a difficulty, advised the defendant to go home and avoid all trouble. He next saw defendant in jail after his removal to Woodstock for trial, made an examination, and found him in a normal mental condition. The only manifestation to the contrary was, that among the exciting events of the 13th of May he claimed to have forgotten having met the doctor in the saloon.

The doctor, upon hearing of the shooting of Gaynor, had said that Dacey must be crazy to shoot his best friend, and still thought so.   Upon his examination of the accused he found some evidences of an old wound on his head, which, in the witness' opinion, might, under some circumstances, have produced mental disturbance, but testifies that defendant was in a normal mental condition, and does not testify that at any time he saw anything indicating that these wounds had affected defendant's mind, or any evidence of mental disease whatever, and based his opinion of defendant's insanity solely upon the ground that a man must be crazy who would shoot his best friend, and what he heard of defendant.   He had heard of no difficulty or ill-feeling between Dacey and Gaynor, and in view of the evidence it is apparent that the principal basis for the doctor's opinion was entirely wanting.

The witness William O'Neil testified that he had known defendant.   Some years ago he had seen him struck on the head with a beer keg, but never saw anything at any time to induce witness to think he was insane or of unsound mind.

The witness Bonfield had been deputy jailor of Cook county. Some years before the trial the defendant had been brought to the jail suffering from *delirium tremens,* and was kept there two weeks, during which his mind was in an unnatural condition, and was then discharged; had known the defendant since, and had seen nothing after his discharge to induce witness to think that he was insane or of unsound mind.

Thomas Powers testified that he thought the defendant insane, and gave as his reason therefor that on one occasion he (Dacey) and a strange man had been playing cards in a saloon, and Dacey said to the stranger, "I could break your back," and witness thought he looked and acted like as if he was not in his right mind.   Witness had also heard him make speeches in the union to which they both belonged, and did not think he talked right, and was of opinion defendant was insane.

Mrs. Sarah O'Neil testified that the defendant returned to her house about two o'clock of the day that Michael Gaynor was killed, and remained until in the evening; that he acted strangely. She asked him if he was drunk or crazy, to which he replied he was not drunk, but was crazy with pain. The witness described his condition as she saw him, and the symptoms detailed would by no means necessarily indicate insanity, and could quite as well proceed from other causes as from mental disease. The witness thought he might or might not be crazy, but thought he was insane.

As to the remaining witness called by the defence upon this issue, Patrick Dacey, but little need be said. He lived at Buffalo, New York, but a portion of the time had been in Chicago, since his brother, James, resided there. This witness testified to the "spells" of *delirium tremens* testified to by Bonfield, Bluthardt, and others, occurring from two to five years before the homicide. He had lived with his brother in Buffalo substantially ten years before his brother came to Chicago. The defendant was afflicted with "spells," and witness had nursed him, sent for the doctors, who had treated him for pneumonia and trouble in his head, and always seemed to relieve him. The last one of these spells occurred some nine years prior to the trial, to the best of the witness' recollection. This witness was of opinion that for more than ten years the defendant had been insane, and was so at the trial.

The testimony of some of these witnesses strongly tends to rebut any inference of insanity, while the testimony of all, when considered together, in our judgment falls short of overcoming the presumption of the sanity of the accused. When, however, it is made apparent by the evidence, as we think it was, that the recurrence of *mania a potu*, testified to by the witnesses, had not affected or impaired the mind of the defendant, and the evidence of Powers, Patrick Dacey and Mrs. O'Neill is considered in connection with the other evidence bearing upon the question of the sanity of the accused, as

well as upon his conduct previous to and at the commission
of the crime, there can not, we think, a doubt remain in the
mind of any reasonable person that the defendant knew right
from wrong, and was fully capable of comprehending the
moral quality of his act, and mentally capable of making in-
telligent choice in respect thereto.

It is suggested, however, rather than argued, that from the
peculiar condition of the accused at the time, being, to some
extent, in ill-health, he was subject to insane delusions when
excited by intoxicating liquor or other cause,—that there was,
by excitement, produced a species of emotional insanity.
We can see no evidence of this, but if true, the emotional
condition must have lasted from early morning until nearly
midnight on the fatal 13th of May, if it had not existed some
weeks before, and this, in view of the evidence, is impossible.
In any event, when the defendant, actuated by actual malice,
arms himself, fixes the time within which his victim must be
slain, seeks the opportunity, and without warning sends the
fatal shot crashing through the brain of his fellow-creature,
the frenzy of the instant, for which he has waited and threat-
ened to bring about, will, neither in law nor morals, absolve
him from responsibility for the crime.

We are constrained, after a most careful examination of
this record, to hold that the evidence fully sustains the find-
ing of the jury, and that in no event, with or without this
instruction complained of, could any other verdict have been
rightfully or lawfully rendered. In no sense, under the rule
of law as declared in the cases cited, and others of this court,
and which is alike binding upon us as upon every other cit-
izen, can it be said that the error in this instruction operated
or could operate to the prejudice of the defendant.

If we were not satisfied, from this record, of the sanity of
the defendant, we might be inclined to hold that the trial
court, in the exercise of a wise discretion, should have con-
tinued the cause; but that court was fully cognizant of the

surrounding circumstances, and of the necessity for such action, and the record made in the cause would not justify us in reversing for that cause.

We are of opinion that the defendant had a fair and impartial trial, with every right accorded him that the law justifies or requires. Having reached this conclusion, we are compelled to hold that we find in this record no such error as will warrant an order of reversal, and the judgment of the circuit court of McHenry county herein will therefore be affirmed, which is accordingly done.

*Judgment affirmed.*

This case was first considered at the March term, 1885, of the Supreme Court, and assigned to Mr. Justice DICKEY for opinion. Owing to ill-health, no opinion was prepared by him. Since his death the case has been again considered, and re-assigned.