THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* AUGUSTUS PENMAN, Plaintiff in Error.

*Opinion filed December 22, 1915.*

1. STATUTES—*rule where it is claimed an amendatory act does not identify act amended.* Where it is claimed that an amendatory act is invalid because it does not identify the act amended, the rule for the guidance of the courts is to ascertain the intention of the legislature and not its mistakes, and if the legislature has expressed its purpose intelligently the act must be upheld.

2. SAME—*amendatory act of 1903, changing terms of court, is valid.* The act of 1903, which does not purport to quote the title of the act amended but is entitled "An act to amend section 7 of chapter 37 of an act fixing the terms of holding court in the several judicial circuits of the State of Illinois, exclusive of Cook county, approved June 11, 1897, and in force July 1, 1897," sufficiently identifies the act amended, even though the words "of chapter 37" must be rejected as surplusage because the act amended has no chapters, the reference evidently being to the chapter of Hurd's Statutes, in which the act appears.

3. CRIMINAL LAW—*when expert should be allowed to state his opinion as to what drug the accused had taken.* In a murder trial, where it is claimed some tablets the accused had taken previous to the homicide were cocaine or some other delirifacient drug and it is impossible to show by direct evidence what the tablets were, the court should permit properly qualified experts to answer hypothetical questions based upon the symptoms and condition of the accused as shown by the evidence, and give their opinion as to what drug the accused had taken, if any.

4. SAME—*expert should be allowed to apply opinion to concrete case.* Where an expert witness who has examined the accused in jail testifies to his physical characteristics and to the general effects of cocaine upon a human being and has stated that the effects of the drug upon persons lasted from a few minutes to several days, he should be allowed to give his opinion as to how long the effect of the drug would last upon the accused and whether it would cause a loss of consciousness or memory.

5. SAME—*when an expert should be allowed to state opinion as to what the accused was suffering from.* In a murder trial, where a physician residing in the same town with the accused and who treated the accused's eyes the day after the homicide has testified to the appearance and actions of the accused, and that he, the witness, is familiar with the effect of cocaine and other like drugs and

has made a study of them, he should be allowed to state the symptoms of cocaine poisoning, and to give his opinion, from symptoms testified to and stated in a hypothetical question, as to what the accused was suffering from when he saw him.

6. SAME—*the court should not permit the People to introduce certain class of testimony denied to accused.* If the court has refused to allow witnesses for the accused, who saw him while he was in jail, to testify as to what they noticed about his actions or whether there was anything peculiar about his eyes, it should also refuse to allow other witnesses, who were present on the same occasion and who are called by the People, to answer the same character of questions.

7. SAME—*accused should be allowed to tell when he put his revolver in his pocket.* In a murder trial, to rebut any inference that might be drawn against the accused from the fact that he had a revolver in his possession at the time of the killing, the accused should be allowed to state that he had put his revolver in his pocket in the morning when he was leaving the town, which was at a time when he could not have anticipated meeting the deceased.

8. SAME—*accused should be permitted to show he took drug involuntarily.* Where it is claimed, in a murder trial, that the accused was suffering from cocaine poisoning or from the effect of some other drug contained in some tablets given him by an acquaintance, the accused should be permitted to state, as bearing on the question of his taking the drug voluntarily or involuntarily, that his acquaintance told him the tablets were breath perfumers.

9. SAME—*instructions should not ignore defense of self-defense.* Instructions which substantially inform the jury that a homicide under the conditions stated therein would be murder are improper, as ignoring the defense of self-defense sought to be established by evidence, even though such defense may not have been made out.

10. SAME—*when instruction is erroneous in ignoring defense of insanity.* Where insanity from the effect of cocaine or some other drug is one of the defenses in a murder trial, it is error to give an instruction stating that it is sufficient to entitle the People to a conviction if the jury believe, from the evidence, that every material allegation in the indictment, or any count thereof, has been proved beyond a reasonable doubt.

11. SAME—*accused does not have burden of proving insanity.* It is not necessary, before the jury can acquit on the ground of insanity, that the evidence should show that the accused was not of sound mind, as it is sufficient if from the evidence there is a reasonable doubt of his sanity.

12. SAME—*what instruction should be given for the defendant.* An instruction having proper basis in the evidence should be given which states that if the jury believe, from the evidence, "that the shooting alleged to have been done by the defendant was done at a time when the defendant was affected by and labored under an attack of a brief or temporary madness or insanity, the result of an involuntary taking by the defendant of some drug preceding the act, and that he was thereby rendered unconscious of what he was doing, that would constitute, in law, a complete and entire defense to the whole prosecution, and he should under such state of proof be acquitted."

13. SAME—*one may act without intention or may intentionally kill without committing murder.* While every sane person must be supposed to intend the ordinary and natural consequences of his act, yet he may act without intention, and one may intentionally kill another in self-defense and not be guilty of murder.

14. SAME—*deliberate use of deadly weapon does not always imply malice.* The deliberate and intentional use of a deadly weapon by which one is killed does not always imply malice so as to make the killing murder.

FARMER, C. J., dissenting.

WRIT OF ERROR to the Circuit Court of Champaign county; the Hon. SOLON PHILBRICK, Judge, presiding.

DOBBINS & DOBBINS, HERRICK & HERRICK, C. C. LE-FORGEE, and F. T. CARSON, for plaintiff in error.

P. J. LUCEY, Attorney General, LOUIS A. BUSCH, State's Attorney, and A. B. GARRETT, (JOHN KEESLAR, A. D. MULLIKEN, and W. G. SPURGIN, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Augustus Penman, having been convicted in the circuit court of Champaign county of murder and sentenced to imprisonment in the penitentiary for life, has sued out a writ of error to reverse the judgment.

The indictment was returned at a term of the court beginning on the first Monday of September, 1913. It is insisted that there was no law authorizing the holding of a

term of the circuit court at that time, and therefore the pro-
ceedings were without jurisdiction and the judgment should
have been arrested. An act approved June 11, 1897, was
passed by the legislature, entitled "An act to amend 'An
act concerning circuit courts and to fix the time for holding
the same in the several counties in the judicial circuits of
the State of Illinois, exclusive of the county of Cook,' ap-
proved May 24, 1879, in force July 1, 1879." (Laws of
1897, p. 191.) The act consists of nineteen sections and is
not divided into chapters. The county of Champaign was
in the sixth circuit, and by section 7 of this act the times
of holding court in that circuit were fixed. In the county
of Champaign the terms were directed to be held on the
fourth Monday of September and the first Monday in
March. In 1903 "An act to amend section 7 of chapter
37 of an act fixing the terms of holding court in the sev-
eral judicial circuits of the State of Illinois, exclusive of
Cook county, approved June 11, 1897, and in force July 1,
1897," was passed. (Laws of 1903, p. 147.) It was en-
acted "that section 7 of chapter 37, fixing the terms of
holding court in the several judicial circuits of the State of
Illinois, exclusive of Cook county, approved June 11, 1897,
in force July 1, 1897, be amended to read as follows: Sec-
tion 7.—In the county of Champaign on the first Monday
in January, the first Monday in April and the first Monday
in September of each year," etc. It is contended that the
title to this act purported to amend a part of a chapter
which did not exist in the act, and that the act itself did
not identify any portion of an existing act and was there-
fore invalid. The title of the act does not purport to quote
the title of the previous act, though it does refer correctly
to the act of 1897 by its subject and the date of its ap-
proval. It refers to chapter 37 when there is no chapter
37 in the act. The omission of the words "of chapter 37"
leaves a correct reference to the act intended to be amended.
The rule for the guidance of courts in such a case is to

ascertain the intention of the legislature, and not its mistakes either as to law or facts. The only question is, has the legislature expressed its purpose intelligently? If it has, the act is valid and must be upheld. (*Patton* v. *People,* 229 Ill. 512; *People* v. *VanBever,* 248 id. 136.) In the latter case the amendatory act was entitled "An act to amend the Criminal Code," while the act sought to be amended was entitled "An act to revise the law in relation to criminal jurisprudence," etc., and the amendatory act was sustained. In *Otis* v. *People,* 196 Ill. 542, the title was, "An act to amend article 8, section 202, of an act entitled an act to establish and maintain a system of free schools." There was no section 202 in the latter act, that number having been given to section 1 of article 8 of the act to establish and maintain a system of free schools, in a private publication in general use throughout the State, known as "Starr & Curtis' Annotated Statutes." The legislature was evidently misled thereby to refer to the section as section 202. It was held that the number "202" might be regarded as surplusage in determining whether the amendatory act was in force. So here, the words "of chapter 37," which evidently referred to the chapter in Hurd's Statutes upon the subject of courts, must be rejected. By so doing the title refers to section 7 of an act fixing the terms of holding court in the several judicial circuits, approved June 11, 1897. This fully describes the act by its subject and the date of its approval and leaves no doubt of the intention of the legislature. The objection to the statute cannot be sustained.

The plaintiff in error on August 9, 1913, the date of the homicide, was a young man a few weeks under twenty-two years of age, living in the village of Philo, in Champaign county, with his father, who was a farmer. The victim of the homicide, Harold A. Shaw, was twenty years old and lived in the city of Urbana with his father, a retired farmer. The young men had been acquainted with one another for about three years, and their relations were,

and had always been, friendly. Shaw was the owner of a two-seated racing automobile which he had been trying to sell to the plaintiff in error. On the afternoon of August 9, 1913, he went to Philo in his automobile, taking with him a companion, Mark Henson. After inquiring for the plaintiff in error at his home and learning that he had gone to Danville and was expected to return in the evening, he went to the railroad station and waited there for the train. Plaintiff in error came on the train, got into the automobile with Shaw and Henson and they went to Penman's home. The plaintiff in error went into the house, and after making some changes in his clothing came out and got in the automobile with Shaw. The two drove off about six o'clock, asking Henson to wait until they returned. About two hours later the plaintiff in error returned in the automobile alone, got Henson and Jesse Wimmer, who lived in Philo near Penman's home, and went to Urbana. They went to Shaw's house, where the plaintiff in error said that Shaw had told him to tell Henson to get an extra tire and rim for the automobile. Henson went into the yard and got the rim but failed to find the tire. They then went to the Illinois Motor Company's garage for a shaft that belonged to the automobile, and plaintiff in error and Wimmer then drove to Philo, arriving there a little after nine o'clock. About 11:30 the plaintiff in error appeared in Villa Grove, ten miles south of Philo, driving the automobile. He drove around the village for about a half hour, taking with him for a ride John Hess, a drug clerk in Villa Grove, and at another time another business man of that place. About 3:30 the next morning he appeared at Wimmer's house, in Philo, and borrowed from him a spade. About three hours later Wimmer found the spade, which had been returned, bearing evidence of having been used. On that day, Sunday, August 10, the plaintiff in error was in the automobile driving rapidly around over the country, and between six and seven o'clock in the afternoon appeared in Urbana at

the residence of Harold Shaw's father. He told the father that he had purchased the automobile from Harold, and that Harold had taken the train the evening before at Villa Grove for Sullivan. Later that same evening the plaintiff in error was in the city of Danville, still driving the automobile, and was arrested for driving without lights. He gave his name as Harold Shaw, said that his father was a retired farmer living in Champaign, and left the car as security for his appearance. He was arrested the next Thursday at Ridge Farm, in Vermilion county, and then gave his name as Johnson, saying that he was from Texas, had been working in Indiana and was looking for a job in Illinois. On Tuesday, August 12, Harold A. Shaw's body was found buried in a pasture belonging to the father of the plaintiff in error, about six miles south of Philo. He had two bullet wounds in his head, one of which passed through the frontal bone, ranged backward and downward through the brain and lodged in the back part of his head, at the base of the skull. This wound was sufficient to cause his death.

The defendant testified on the trial that after he got in the automobile at his home with Shaw they drove to Villa Grove and back from Villa Grove to the pasture in which Shaw's body was afterward found. There he remembered that he had received a letter from his father, who was in Missouri, telling him to see that some posts in a fence which had been left loose were properly set to prevent the wandering away of the stock in the pasture. He had to walk from the road about a quarter of a mile to the fence. Shaw went with him. They were talking about the purchase of Shaw's automobile by the plaintiff in error. When they got near the fence Shaw said that he hated to part with the old boat, and the plaintiff in error answered that he did not know that Shaw had to part with it. Thereupon Shaw stated that he had sold the car to the plaintiff in error and the plaintiff in error had to take it. The plaintiff in error asked what Shaw would do if he did not take it, and Shaw replied that

he would knock hell out of him. Plaintiff in error replied
that he did not know that he would, and with this Shaw
answered, "You long-legged giraffe, you will have to take
it," and then struck plaintiff in error on the breast with his
fist. The plaintiff in error testified that he then "flew all
to pieces and did not know what happened." He could
recall nothing afterward until he awoke lying in his bed at
home, without any recollection as to how he got there or
knowledge where he was or what time it was; that he had
an indistinct recollection of having been in the pasture with
Shaw; that he got up, looked out of the window, saw
Shaw's car standing in front of the house, went out and
drove down to the pasture lot, where he last remembered
seeing Shaw. He saw Shaw lying there dead. He lay down
and cried for about a half hour and then covered Shaw's
face with his handkerchief, drove to Villa Grove, picked up
Hess, drove around there for awhile and then went back to
Philo. He decided to leave the country but could not bear
to leave Shaw unburied. He went to Wimmer's house,
called him out of bed, borrowed the spade, drove back to
the pasture lot, dug a hole there, placed the body in it and
covered it. He then drove about over the country the rest
of the night and the following day. In regard to his ac-
tions subsequent to his arrest at Danville, Sunday night, he
stated that he went from Danville to Indianapolis and there
attempted to enlist in the navy, but was unsuccessful be-
cause he did not fill the physical requirements; that he went
from Indianapolis to Cincinnati, intending to work his way
down the Ohio and Mississippi rivers on a boat with the
intention of going to South America; that he abandoned
this plan and went to Hamilton, Ohio, where he wrote a
post-card, addressed to himself at Philo and signed with
the name of Harold Shaw. This card was received by mail
at his home in Philo. From Hamilton he returned to In-
dianapolis and got on a train for Danville. Before the
train was out of the yards in Indianapolis he was recog-

nized by the conductor, who had seen him on the train when he left Danville, and he thereupon jumped from the moving train and made his way on foot out of the city of Indianapolis. He then went to Terre Haute, where he spent the night with a family he had previously known, and from there to Danville, where he first read in a Danville paper that he was being sought. From there he went to Ridge Farm, where he was arrested Thursday, August 14, while asleep in a box-car.

The defenses relied upon by the plaintiff in error were insanity and self-defense. The defense of insanity was based upon testimony to the following facts: The plaintiff in error weighed only four and a half pounds at birth and was born after only seven months' gestation. During 1912, continuing until the spring of 1913, he had a dozen or more spells when things went dark before his eyes and he would sometimes fall over. On the morning of August 9 he went to Danville on the cars and spent the day in that city, returning on the evening train. During the preceding week he had worked during the day and had spent all but two nights sitting up with and waiting upon an old man, a neighbor, who was ill. While in Danville he drank three glasses of beer and nothing else. He went during the afternoon to a house of prostitution, which he had visited before on that same day. He was accompanied by two other men. They went into a dance room in the house, in which there was another man, who, after talking with the plaintiff in error, opened a little paste-board box in which there were some pinkish tablets and gave plaintiff in error one. Plaintiff in error bit it, and finding it bitter spat it out in the cuspidor, but shortly after took three or four more, which he swallowed. They were about the size of cinnamon drops. He left the house in a few minutes to go to his train. He was dizzy and his strength failed him. He tried to carry a suit-case for a friend but was unable to pick it up. His throat and tongue were parched and dry and he was nau-

seated. This condition continued while he was on the train. He drank much water, but it did not relieve the parched condition of his throat. He was dazed, his gait was uncertain, he could not see clearly, his eyes were glassy and staring. His memory was not clear from the time he got in the automobile at his home with Shaw. While going from the automobile into the pasture with Shaw he vomited, was dizzy and walked with difficulty. After being struck by Shaw he had no recollection of anything until he woke up in his bed at home. In the meantime he had driven in the automobile six miles to Philo, got Henson and Wimmer, driven nine miles to Urbana, taken a drink of coca cola, driven about the streets awhile, drunk a quantity of water and immediately vomited, and had returned in the automobile with Wimmer to Philo. When he found himself in bed at home he got up and drove ten miles to Villa Grove and drove about the town at a high speed, which he did not slacken in turning corners. The next day his eyes were glaring, the pupils distended and their expression wild, his skin was clammy and his hands were twitching. He spent that night traveling on foot, in the automobile and on cars and the next day felt a crawling sensation all over. Many witnesses testified to the good reputation of plaintiff in error as a peaceable, law-abiding citizen.

It was the claim of the defense that the tablets taken by the plaintiff in error in Danville contained cocaine or some other delirifacient drug, and that his actions, condition and appearance could not be accounted for on any other reasonable hypothesis. Evidence of expert witnesses was offered to show the effect produced by the taking of cocaine, the opinions of such witnesses, given in answer to hypothetical questions, that the plaintiff in error was suffering from cocaine poisoning and was insane on the evening of August 9, 1913, and the symptoms which formed the basis of such opinions.

Dr. Norbury made an examination of the plaintiff in error in the jail on September 4, 1913. After describing his physical characteristics and the general effects of cocaine upon a human being, he stated that the effects of the drug upon persons lasted from a few minutes to several days. He was asked, but the court refused to let him give his opinion, as to how long the effect upon the plaintiff in error would last or whether it would cause a loss of consciousness or memory. Dr. Jesse testified that he was familiar with the effect of delirifacient drugs and had made a study of cocaine and like drugs. The court refused to permit him to answer what were the symptoms of cocaine poisoning, or to give his opinion, from symptoms testified to and stated in a hypothetical question, as to what the plaintiff in error was suffering from, or to answer whether he had an opinion or not. Dr. Jesse saw the plaintiff in error at the doctor's house about five o'clock in the afternoon of Sunday, August 10, and treated his eyes. He described his appearance and actions at that time. A hypothetical question was put to him including his condition on Sunday. It was objected to on the ground that it took into consideration facts occurring on the day following the homicide, and he was not allowed to answer. The court should have allowed these questions to be answered. The plaintiff in error should not have been confined to mere opinions that he was suffering from cocaine poisoning and was insane, nor to his condition at the precise time of the events under investigation. Dr. Norbury having testified that persons might be affected by cocaine from a few minutes to several days, should have been permitted to apply his knowledge directly to the case in hand, and to answer, from his personal examination of the plaintiff in error and the knowledge of his physical characteristics acquired by such examination, how long the plaintiff in error would be affected and whether his consciousness or memory would be

affected. The plaintiff in error had a right to submit to the jury the expert's opinion on the concrete case.

When the objection was sustained to the question asked Dr. Jesse in regard to the symptoms of cocaine poisoning, the objection made was that there was no evidence that the plaintiff in error had ever taken cocaine, and the court said, "I don't think so." After argument by the defendant's counsel the court stated that there was no evidence that any drug of any specific character had been given; if there had been the witness might describe it and then describe the effects; that the way to reach it was to describe the condition of the man and then let the doctor tell what kind of a drug he thinks he had. Practically all the defendant's witnesses had then testified except the experts, and thereupon the plaintiff in error's counsel asked a hypothetical question including the facts testified to in regard to the condition of the plaintiff in error and calling for the witness' opinion, from those symptoms, as to the cause of that condition. The court then sustained an objection to that question, and it was error to do so. It was impossible to furnish direct evidence that the plaintiff in error had taken cocaine or any other poisonous drug, but there was evidence of his condition and certain symptoms of the cause of which a witness having expert knowledge of the effect of drugs might form a reasonable opinion which would be a proper basis from which the jury might reasonably infer the taking of a particular drug. To exclude such evidence was to prevent the plaintiff in error from proving the defense he was trying to establish. Evidence of this character from two other experts was admitted, but Dr. Jesse saw the plaintiff in error on the day after the tragedy, he lived in Philo, in the county in which this case was tried, and the plaintiff in error had the right to his testimony, and ought not to have been limited, as he was by this ruling, to the testimony of two expert witnesses coming from foreign counties.

While the defendant was in the jail at Danville, after his arrest, awaiting his transfer to Urbana, he was seen by several persons. Two of them were offered as witnesses by the defense. One was asked whether or not he noticed the actions of the plaintiff in error there, and an objection to the question as leading was sustained. He was asked to tell what he noticed about him there, and an objection was sustained. He was asked to describe the appearance of the plaintiff in error's eyes with reference to looking natural or unnatural, and an objection was sustained. The other witness was asked whether, in the conversation he had testified he had with the plaintiff in error, he observed his eyes, the general appearance of his eyes or the look out of his eyes, and an objection was sustained. Two witnesses who were present at the same time were offered by the People. One was asked if he noticed anything with reference to his eyes, and a motion to exclude the answer was overruled. The other was asked to describe the condition the defendant was in, and an objection was overruled; to tell what he observed with reference to the defendant's actions and looks, and an objection was overruled; if he observed anything with reference to the expression on his face and the look from his eyes to tell about it, and an objection was overruled. A consistent rule would require all this testimony to be received or all rejected, as well that offered by the People as that offered by the plaintiff in error..

The court erred in excluding the defendant's testimony that he put his revolver in his pocket in the morning when he went to Danville. An inference of malice or premeditation might be drawn, or at least argued, from his possession of the revolver at the time of the killing, and it was proper to show that he had taken it at a time when he could not anticipate meeting the deceased. The evidence in regard to injuries to his head by being kicked by a horse and being thrown from a motorcycle in 1912 or 1913 should also have been received, as well as the statements of Shaw

that the plaintiff in error had bought the automobile and that Shaw intended to make him take it, and that upon being told that that might be pretty hard to do, Shaw said he knew a way to make him take it. The evidence tended to throw light on the relation of the parties and was competent.

The plaintiff in error attempted to prove that the man who gave him the tablets in Danville told him they were breath perfumers, but was not permitted to do so. The testimony should have been received. The defense of insanity was based upon the taking of those tablets, and whether the defendant took them voluntarily knowing what they were, or involuntarily took cocaine supposing it to be some innocent thing, was a question materially affecting his responsibility. It was proper to show what was said, in order to show that he was deceived into taking the tablets supposing them to be innocent.

Complaint is made of instructions 13, 12 and 10 given at the request of the People. They are as follows:

13. "The court instructs the jury that the law presumes that a person intends all the natural, probable and usual consequences of his act; that when one person assaults another violently, in a way and manner likely to kill, and such assault is not committed in self-defense and not in a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible or involuntary, and the life of the person thus assaulted is actually destroyed in consequence of such assault, then the legal and natural presumption is that death or great bodily harm was intended, and in such case the law implies malice, and such killing would be murder."

12. "The court instructs the jury, as a matter of law, that the words 'malice aforethought' do not necessarily imply the lapse of any considerable time between the forming of a malicious intent to take life and the actual execution of that intent. Whether the design to effect death was formed

on the instant or had been previously entertained is immaterial, for the malicious killing, if proven by the evidence beyond a reasonable doubt, in either case is murder under the laws of this State."

10. "The court instructs the jury that where one person kills another with a deadly weapon, no words of reproach or gesture, however irritating or provoking, amount to a considerable provocation in law; and where one person unlawfully kills another by shooting him with a deadly and dangerous weapon where no considerable provocation appears, or provocation apparently sufficient to excite irresistible passion, the law makes such killing murder."

These instructions have been commented upon and criticised in various cases involving the defense of self-defense. (*People* v. *Bissett,* 246 Ill. 516; *People* v. *Jacobs,* 243 id. 580; *Friederich* v. *People,* 147 id. 310; *Hammond* v. *People,* 199 id. 173; *Marzen* v. *People,* 173 id. 43.) The criticism made in the cases cited with reference to these instructions is that they may be construed as ignoring the right of self-defense. While every sane person must be supposed to intend the ordinary and natural consequences of his intentional act, yet he may act without intention. One may intentionally kill another in self-defense and not be guilty of murder; so an intention to kill may be formed upon a sudden heat of passion arising from a provocation sufficient to make the killing manslaughter. The deliberate and intentional use of a deadly weapon by which one is killed does not always imply malice so as to make the killing murder. Although the defense of self-defense may not have been made out, there was evidence on that question tending to a reduction of the crime from murder to manslaughter. Further, they ignore the defense of insanity, and in substance instructed the jury that a homicide committed under the conditions stated would be murder. These instructions should not have been given in this form.

The eighth instruction informed the jury that it was sufficient to entitle the People to a conviction if the jury believed, from the evidence, that every material allegation in the indictment, or any count thereof, has been proved beyond a reasonable doubt. This instruction also ignored the defense of insanity.

The seventeenth instruction informed the jury that the law presumes every man to be sane until the contrary is shown, and when insanity is set up as a defense by a person accused of crime, then, before the jury can acquit the accused on the ground of insanity, it must appear from the evidence in the case that at the time of the commission of the crime the accused was not of sound mind but affected with insanity to such a degree as to create an uncontrollable impulse to do the act charged, by overriding his reason and judgment and obliterating his sense of right and wrong as to the particular act done and depriving him of the power of choosing between them. This imposed the burden of proving insanity upon the plaintiff in error. It is not necessary before the jury can acquit on the ground of insanity that the evidence should show that the accused was not of sound mind. It is sufficient if from the evidence there is a reasonable doubt of his sanity. *Dacey* v. *People,* 116 Ill. 555.

The court refused instruction No. 56 asked by the defendant. This instruction is as follows:

56. "The jury are instructed that if you believe, from the evidence, that the shooting alleged to have been done by the defendant was done at a time when the defendant was affected by and labored under an attack of a brief or temporary madness or insanity, the result of an involuntary taking by the defendant of some drug preceding the act, and that he was thereby rendered unconscious of what he was doing, that would constitute, in law, a complete and entire defense to the whole prosecution, and he should, under such state of the proof, be acquitted."

271 — 7

This instruction stated a correct rule of law which was not included in any other instruction given to the jury. It was error to refuse it.

Objection is made to the giving and refusal of other instructions, but we do not deem it necessary to discuss them.

For the errors indicated the judgment of the circuit court will be reversed and the cause remanded.

*Reversed and remanded.*

Mr. CHIEF JUSTICE FARMER, dissenting.