---

(No. 12242.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HOWARD McDOWELL, Plaintiff in Error.

*Opinion filed October 21, 1918.*

1. CRIMINAL LAW—*when it is error in a murder trial to admit evidence of another offense.* In a murder trial, where self-defense is relied upon, it is error to admit evidence tending to show that the defendant, some two years previous to the homicide, had wounded the decedent with a shot-gun, where the defendant denies that he was the person who did the shooting at that time and the evidence on that point is highly conflicting.

2. SAME—*court should not unduly restrict opening statement of defendant's counsel.* The defendant in a criminal case has a right to have his counsel state to the jury, within reasonable limits, the facts which he expects to prove, and it is error for the court to unduly restrict counsel in such statement on the mistaken claim that he is making an argument.

3. SAME—*when instruction is erroneous in ignoring defense relied upon.* In a murder trial, where self-defense is relied upon and the testimony of the eye-witnesses is conflicting, it is error to give

an instruction stating that if the defendant formed on the instant an intent or design to kill the deceased it mattered not whether such intention had been previously entertained, and that if the killing was proven to have been maliciously done it would be murder.

WRIT OF ERROR to the Circuit Court of Hardin county; the Hon. CHARLES H. MILLER, Judge, presiding.

H. ROBERT FOWLER, JAMES A. WATSON, and RICHARD F. TAYLOR, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, CLARENCE E. SOWARD, State's Attorney, ALBERT D. RODENBERG, and MATTHEW MILLS, (JOHN Q. A. LEDBETTER, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error, Howard McDowell, (hereafter called defendant,) was indicted, tried and convicted in the circuit court of Hardin county for the murder of Gipson Lanier. The jury found defendant to be twenty-six years of age and fixed his punishment at fourteen years in the penitentiary. Defendant has brought the record to this court for review and assigns numerous grounds for the reversal of the judgment.

The homicide occurred about two o'clock on Sunday afternoon, August 27, 1916, in a public highway in front of a store at Lamb, Illinois, which is a small country trading place. The store in question was operated by T. J. Belt. The highway runs east and west and the store is on the north side of the road and faces south. There is a porch with a low roof in front of the building. There are two doors to the store building,—one at the front or south end and the other on the east side, some distance back from the front. The storekeeper and his family lived in a house just east of the store, and in order to reach the door on the east side of the store building it was necessary to pass through the yard of the storekeeper. There was a fence

in front of his home, which connected with the southeast corner of the store building. There was a gate through this fence some twelve or fifteen feet east of the store building. Across the road south from and about opposite the southeast corner of the store building was a well, with a pump in it. On three sides of the well was a low fence. The land here sloped to the south, the south or front end of the store building being higher off the ground than the north or rear end. This slope continued across the road, and the land where the well was located was several feet lower than it was at the front of the store.

Defendant and deceased were brothers-in-law, the latter having married the former's sister some five or six years before the homicide. After the marriage deceased and his wife lived at the home of his father. During the winter of 1911-12 the home was destroyed by fire, and deceased and his wife both had their feet frostbitten and were unable to walk for some time. They went or were taken to the home of defendant's father, where defendant also lived, and stayed there several months. Deceased and his wife then again went to his father's. They separated in the spring of 1913 and the wife went home to her father's. In July following she wrote her husband a letter, and they went together again in August, 1913. In March, 1914, the deceased with his family and parents moved to Gallatin county. In November, 1914, he and his wife returned to Hardin county for a visit. He took his wife to her father's in a wagon, helped her to unload her trunk, talked to his father-in-law for a few minutes, and then started to go to his brother's, who lived only a few miles away. As he was leaving, and while passing along the road near the barn of his father-in-law, he was shot with a shot-gun, the shot entering the back of his head and neck. When he was able he and his wife returned to their home in Gallatin county. In March, 1915, he again came to Hardin county to see his brother, who was sick. He stayed over night, returning

home the next day. On Friday, August 25, 1916, he came
back to Hardin county with his brother Howard to his
brother Raymond's to get a mule. They came in a buggy
and stayed at Raymond's home until Sunday afternoon,
August 27, 1916. They started home soon after the noon
hour, the deceased driving a double rig. In the bed of the
buggy were peaches and a lard can filled with plums was in
the front of the buggy. Howard was following the buggy,
riding a horse. They were going west on the highway
which passes the store at Lamb before described.

There is nothing in the testimony to indicate that de-
fendant knew deceased was in the county or that a meet-
ing was expected by either of the parties on the day of the
shooting. Defendant and his brother, George, went to the
store at Lamb Sunday afternoon, going in through the east
door, which was open, and made some purchases. The de-
fendant bought some fruit-can rubbers and his brother some
molasses and some cups and saucers. They went to the
store on horseback. Defendant hitched his horse to the
fence east of the store and his brother hitched the mule
he was riding near the well. While they were in the store
three young men of the neighborhood were also in the store.
After defendant and his brother came out of the store they
took their purchases to the east end of the porch to pre-
pare them for convenient carrying on horseback. About
the time they came out of the store the other young men
came out also and went across the road to the well. At
about that time the deceased, his brother Howard and Tom
Crow came up and stopped at the well, the two latter be-
ing on horseback. Howard got off his horse, hitched it
and went into the store to get some tobacco. Crow alighted,
hitched his horse and went to the pump to get a drink. De-
ceased sat in his buggy, talking to the parties at the well.
No word had been spoken between deceased and defendant
when a shot was fired. One of the four men at the well
with deceased testified he saw defendant fire the first shot.

The other three men did not see the first shot fired, but their testimony as to the facts and circumstances makes it appear that the deceased did not fire the first shot. Defendant and his brother testified deceased fired the first shot. There was a difference in the testimony of the witnesses as to the number of shots fired. It is clear there were six, at least. Defendant testified that after deceased first fired at him and started towards him he retreated onto the porch for the purpose of getting into the store by the front door, which he found locked; that he fired two shots into the ground to stop deceased, but he continued to advance, firing, and defendant then fired two more shots, both of which took effect, one of them being fatal. The deceased had advanced about two-thirds of the distance from the buggy to the porch when he fell. It is clear, also, from the testimony that the deceased fired two shots. One of them hit a corner board of the store, and defendant testified it passed through the lapel of his coat. The other shot took effect in the roof of the porch. It appeared from the evidence that there was ill-feeling between defendant and deceased for some time prior to the homicide. It was proved that deceased had made numerous threats to kill defendant, and on some occasions had requested the parties to whom the threats were made to communicate them to defendant, which they did. It was also proved that the defendant had made some threats against deceased.

Without expressing any view of the sufficiency of the evidence to sustain the conviction, the facts and circumstances proven were such that it cannot be said the errors hereafter referred to could not reasonably have had an effect upon the jury in arriving at their verdict.

Over the objection of defendant the court permitted the prosecution to prove on the trial that in November, 1914, deceased took his wife to her father's in a wagon drawn by two horses. Defendant at that time was a single man living in his father's family and was at his father's home when

his sister was brought there by her husband, the deceased. The deceased did not go into the house but left his wife there and drove away. As he drove along the road past the barn lot of his father-in-law someone shot him with a shot-gun, some of the shot striking him in the neck and other parts of the body. No one saw the person who did the shooting and no complaint appears to have been made against anyone for it. There appears to have been some suspicion or talk that one of two brothers mentioned did the shooting. The widow of deceased testified as a witness for the prosecution that she heard the report of the gun and went out of the house toward the barn lot and met her brother, the defendant, coming from that direction toward the house and that he was carrying a shot-gun. She testified that some time before that she and her husband had separated and she went to her father's; that defendant was opposed to her going back to live with her husband and told her if she did he would kill him. Another sister of defendant was permitted to testify that defendant told her at another sister's house, on an occasion she described, that he had shot the deceased in November, 1914. The sister at whose house it was said that statement was made, and her husband, both testified to being present and remembering the occasion referred to by the witness and that no such statement was made by the defendant. Defendant denied he did the shooting in November, 1914, denied he left his father's house until after deceased had gone, denied he went out to the barn lot, and denied that the wife of deceased met him and that he was carrying a shot-gun. He was corroborated about remaining in the house by other members of the family. It will be seen the evidence of defendant's having done the shooting at that time was highly conflicting. That shooting was a distinct, substantive offense. It had no connection with the acts which resulted in the homicide, and all that can be claimed for it is that it tended to show the animus or state of mind of defendant toward

deceased. It was competent for the prosecution to prove threats made by defendant against deceased, but to permit testimony that defendant had committed another distinct offense, the correctness of which testimony was not conceded but was vigorously disputed, was erroneous and prejudicial. It amounted to trying defendant on two charges, to both of which he denied his guilt. The question presented is quite different from what it would have been if defendant had admitted or had not denied he did the shooting in November, 1914. The case does not come within the exception to the general rule announced in *Farris* v. *People,* 129 Ill. 521, *Lyons* v. *People,* 137 id. 602, *Henry* v. *People,* 198 id. 162, and *Schultz* v. *People,* 210 id. 196, that proof of a distinct, substantive offense cannot be admitted to prove another offense. That defendant killed deceased was not disputed. There were several eye-witnesses to the homicide and the dispute was as to whether the killing was justifiable homicide. It was error, under the circumstances here presented, to permit the evidence of a previous offense introduced by the prosecution.

Complaint is made of the ruling of the court in sustaining objections of counsel for the prosecution to the opening statement of counsel for defendant and unreasonably restricting counsel in his statement. Counsel for defendant said in his opening statement that the law of self-defense is laid down in sections 148 and 149 of the statute, and then proceeded to tell the jury that defendant proposed to prove certain threats made by deceased against defendant. Counsel for the prosecution objected to the statement upon the ground that it was argument, and the court admonished counsel making the opening statement to state briefly what he expected to prove and not argue the case at that time. Counsel for defendant objected to the statement of the court and the court told him to proceed. Counsel proceeded and said, "We will prove, gentlemen of the jury,"—and at this point counsel for the prosecution objected that the state-

ment was an argument. The court sustained the objection
and told counsel not to argue but to state the facts. Coun-
sel for defendant replied he was stating the facts, and the
court said, "You are arguing this case." Counsel again ob-
jected to the statement of the court, and the court ordered
counsel to state his case in accordance with the instructions
of the court. The court erred in sustaining the objections
to the statement and characterizing it as argument. So far
as disclosed by the abstract, counsel was proceeding to state
what he proposed to prove and was not arguing the case
when he was interfered with and stopped by the court.
Counsel had a right, in his opening statement in behalf of
the defendant, to state briefly, within reasonable limits, the
facts defendant relied on and expected to prove in his de-
fense. It is an important right to a defendant in a crimi-
nal case that his counsel shall not be prevented or unrea-
sonably hindered by the court in the performance of his
duty at every stage of the trial, within the requirements of
the law. The court erred in denying defendant this right.
*People* v. *Hamilton,* 268 Ill. 390.

Thirty instructions were given for the prosecution and
thirty-six for defendant. Complaint is made by counsel of
a majority of the instructions given at the request of the
prosecution, but we will not discuss them all separately and
in detail. The principal fault of the instructions is, that
while in some murder prosecutions where self-defense is
not relied upon by defendant they might be unobjectionable,
yet where that defense is interposed, as here, it should not
be ignored in the instructions. The instructions are not
numbered in the brief for defendant as they are in the ab-
stract, and we will observe the abstract numbers where we
refer to particular instructions. Instruction No. 1 is prac-
tically a literal copy of an instruction condemned in *Peo-
ple* v. *Penman,* 271 Ill. 82. It told the jury that if the de-
fendant formed an intent or design on the instant to kill
deceased it mattered not whether such intention ·had been

previously entertained, and if the killing was proven to have been maliciously done it would be murder. The instruction as given ignored defendant's defense. The same is also true of instruction No. 20. These instructions were erroneous in a particular that was prejudicial to defendant. (*People* v. *Penman, supra; People* v. *Bissett,* 246 Ill. 516; *People* v. *Jacobs,* 243 id. 580.) There were errors in certain other instructions, less vital, which we will not particularly discuss, as the suggestions herein made are sufficient for guidance in the preparation of instructions upon a new trial.

A number of the witnesses for the prosecution had testified at the coroner's inquest and on a motion to admit defendant to bail. Counsel for defendant had what purported to be the questions asked of and the answers made by the witnesses on those two occasions, and sought to lay the foundation for impeaching certain witnesses by reading from their previous testimony questions asked them and answers made thereto and asking the witnesses if such questions were not asked and such answers made by them in their previous testimony. The court sustained objections to a number of questions of this character asked some of the witnesses, which was erroneous, but in reading the abstract of the testimony we get the understanding that this error was later obviated by permitting the witnesses to be examined upon the subjects of their former testimony.

It is also complained that the court made remarks during the trial prejudicial to defendant. The remarks of the court complained of do not appear to have been of a serious character and would not afford grounds for a reversal of the judgment.

For the errors indicated the judgment is reversed and the cause remanded.    *Reversed and remanded.*