(No. 13790.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EUGENE GEARY, Plaintiff in Error.

*Opinion filed April 21, 1921—Rehearing denied June 9, 1921.*

1. CRIMINAL LAW—*when physician who does not testify as an expert may give opinion as to sanity of defendant.* Where expert witnesses for the defendant in a murder trial have given their opinions that he was insane, a physician who is not an expert on mental diseases but who has known and treated the defendant many years and who examined him and talked with him the day he was arrested, may, after testifying to the facts and the conduct of the defendant, give his opinion that the defendant was sane.

2. SAME—*when revolvers found in possession of defendant are admissible in evidence.* Where insanity is the defense to a charge of murder, loaded revolvers found in a stove in the room where the defendant was secreting himself at the time of his arrest, although they are not of the same caliber as the one with which the homicide was committed, are admissible in evidence as tending to show an understanding by the defendant that his act in shooting the deceased was criminal.

3. SAME—*hypothetical question need not include controverted facts which questioner does not admit.* A hypothetical question

need not assume the existence of a fact concerning which testimony has been given if the fact is controverted and is to be submitted to the jury for determination, but the questioner may select such facts as he claims to exist, concerning which the evidence is conflicting, and the jury are to determine whether the facts have been proved.

4. SAME—*hypothetical question must include all essential facts as claimed and proved by the party proposing the question.* Where the evidence is conflicting a hypothetical question should embrace only the facts tending to support the claim of the party proposing the question, but the question should include all the essential facts as claimed and proved by said party, as a question omitting facts which would necessarily enter into the opinion of the witness tends to mislead the jury by causing them to adopt an opinion without regard to the facts on which it is based.

5. SAME—*when instruction relating to circumstantial evidence is proper.* Although the commission of a homicide is proved by the direct and positive testimony of eye-witnesses, yet if the defense is insanity it is proper to give an instruction relating to circumstantial evidence, where evidence as to the conduct of the defendant before and after the homicide is in the record on the question whether he was sane or insane or was capable of forming an intent.

6. SAME—*defendant is presumed to be sane until insanity is made to appear by the evidence.* As sanity is the normal condition of man and insanity an abnormal state, the presumption in a criminal case is that the defendant is sane and personally responsible for his acts; and this presumption inheres at every stage of the trial until insanity is made to appear by the evidence.

7. SAME—*when proof of hallucinations is no defense to charge of murder.* Evidence that the defendant had certain hallucinations and delusions caused by his physical condition is not a defense to the charge of murder where there is no evidence connecting the victim of the homicide with the hallucinations, where the conduct of the defendant after the crime tends to prove that he knew his act was wrong and that he did not act on an irresistible impulse. and where the expert testimony for the People tends strongly to show that he was sane.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding.

THOMAS D. NASH, and MICHAEL J. AHERN, (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

297—39

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, of counsel,) for the People.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

About ten o'clock at night on Thursday, May 27, 1920, the plaintiff in error, Eugene Geary, shot and killed Harry Reckas in the Horn Palace saloon, in Chicago. He was tried in the criminal court of Cook county upon an indictment charging him with murder and the jury found him guilty and fixed his punishment at death. The court, after overruling motions for a new trial and in arrest of judgment, pronounced sentence on the verdict, and a writ of error and *supersedeas* were allowed by this court to permit a consideration of the alleged errors assigned on the record.

At the trial the homicide was admitted and the defense interposed was insanity of the defendant, and there was no dispute or controversy concerning any evidentiary fact relating to either of those questions. Evidence was offered of the appearance, manner, declarations and conduct of the defendant for a few days before the homicide, which evidence was not controverted or questioned in any way, and the issue submitted to the jury was whether the defendant, from long continued use of alcohol, had become incapable of distinguishing right from wrong with respect to the act he committed, or through his mental condition was impelled to the commission of the act by an impulse which he was incapable of resisting. That issue was found against the defendant by the jury and the finding was approved by the court.

At the time of the homicide Harry Reckas and Timothy J. Fell went into the Horn Palace saloon. Those present in the saloon at the time, beside Reckas and Fell, were David Ruse, bar-tender, Walter Brown, Merrick Shattuck

(known as "Lunch" Shattuck) and Edward J. Davis, a po-
liceman. Reckas asked the bar-tender if Mr. O'Brien was
in, and the bar-tender replied that he was not but would
be in shortly. Someone asked what Reckas wanted to see
O'Brien for, and Fell said that Reckas had purchased water
when he thought he was getting whisky, and Fell had
learned that O'Brien had been victimized in the same way.
Fell had two glasses of ginger ale and Reckas two glasses
of near beer and cigars, and as Fell and Reckas were leav-
ing the saloon the defendant came in. When five or six
feet from the door the defendant met Reckas and asked
him, "Who are you looking for?" and Reckas said, "No-
body; we are going home." The defendant took hold of
the lapel of Reckas' coat and the bar-tender came from be-
hind the bar and said to the defendant, "Gene, these men
are friends of Mr. O'Brien; you are not looking for them."
The defendant let go of the coat lapel and Reckas started
out of the saloon and the defendant shot him in the left
side and killed him. Reckas was unarmed and did not
make any demonstration or say anything except that he
was going home. The defendant then turned to Fell and
leveled his gun at Fell's stomach. Fell said: "Surely you
don't want to shoot me; I don't even know you; I never
saw you before; we have had no trouble here to-night;
you are in trouble enough already; I am a friend of Mr.
O'Brien and came in here to get a drink." The defendant
dropped his hand and put his gun in his pocket, and Da-
vis, the policeman, who was acquainted with the defendant,
went up to him and said, "Hello, Gene," and the defendant
replied, "Hello, Davis." The defendant left the saloon by
the rear door and disappeared from his usual residence and
haunts. He had lived at the Stock Yards Inn,—a hotel
across the street from the saloon,—and the police officers
searched for him until he was found on June 3, 1920, in
the daytime, in bed in a darkened room at 436 West
Forty-second place. He was arrested, and the officers made

a search and found two 38-caliber loaded revolvers and some shells in an unused stove just outside the door in an adjoining room, and the defendant had stove-black on his hands and a smear of the same on the left side of his face. He had been drunk in the afternoon of the homicide and was drunk when it occurred.

On the part of the defendant it was proved that he had syphilis of nineteen years' standing, and spinal fluid extracted from his spine, and other tests, showed that the disease was in an advanced stage. It was also proved that he had a long continued habit of drinking intoxicants and was a confirmed alcoholic, and thirteen witnesses testified to his demeanor, conduct, appearance and statements,—one of them six days before the homicide and the others for four days previous to the homicide. He came to the house of one of the witnesses Friday evening, May 21, 1920, intoxicated, and said he was going to die in a few days and took some of his shirts out of a drawer, in which there was an empty gun. The witness told him the gun was empty and took it and put it in the drawer and told him to go to bed. The witness gave him a drink of whisky and he slept well until three or four o'clock in the morning and was then heard walking up and down the floor and said he was nervous and could not sleep. He stayed at that place two nights and acted in the same way, would not eat and was vomiting, and complained that there was a light in front of the house and said someone was throwing lights at him. On Sunday evening, May 23, he went to his mother's house and from that time was sober until the afternoon before the homicide. He stayed at his mother's and other places and during that time ate little or nothing, did not sleep but walked around most of the night and said they were throwing lights at him; that the yellow-cab fellows threw electric lights on the window and moving pictures on the wall, and when they went along the street would toot their horns and say they would get him. He

would not permit the electric light to be turned off and said they were flashing lights on him. Once he got out of bed and said there was a fellow whistling in the next room, and in the morning said there was a yellow cab down there and they were down there now trying to get at him. Once he asked another man to go to his room with him as he was nervous and afraid,—that those yellow fellows were after him; and he looked around the room and under the bed and said they never could tell who was liable to be there,—you might find those yellow fellows any place. On Monday night, at his mother's home, he went to bed and was found the next morning lying on a lounge, and said he could not sleep because the baby, seven years old, brought sand-flies in the house and in the bed, and sand-flies and bugs were crawling on the food. He was in the cigar business, and on Monday or Tuesday preceding the homicide, when a cigar dealer delivered him 1000 cigars and he gave an order for more, he said he had to be careful,—they were after him. In the afternoon of the day of the homicide he went into a saloon and said two or three fellows chased him up the street. He was given a drink of whisky and drank until the whisky was all gone. He seemed to get quiet after he began drinking, and when the whisky was gone he told the man who gave him the whisky to stay there until he came back, and he came back in a few minutes with a pint bottle of whisky. He gave the man $100 to give to his mother, and when the man reported that he had delivered the money to defendant's mother he said that was all right and asked how she was. Several of these witnesses, after detailing their observation of the defendant, gave opinions that he was insane when they observed him.

Objection is made to a ruling of the court permitting the cross-examination of the witness at whose house defendant stayed the first two nights, by which it was shown that the witness had been in the Bridewell and had just got out, and cross-examination of another witness to show

that while he drank three or four drinks of whisky per day he was a sort of hanger-on or loafer around saloons and paid nothing for the whisky. The objection is that the cross-examination only tended to degrade the witnesses, but, whether the rulings were right or wrong, no harm was done to the defendant because there was no controversy about the facts to which the witnesses testified and the same facts were proved by several other witnesses.

A witness who testified to the conduct of the defendant and gave an opinion that he was insane volunteered the statement, "He looks all right now," and was asked as to his opinion whether he was then insane. The court overruled an objection, and said that if the witness did not have an opinion he need not give any, and the answer was, "I don't know." As the witness gave no opinion but said that he did not know, the error, if any, was harmless.

It is also objected that the court permitted a doctor who was not an expert on mental diseases but who had known the defendant 25 or 30 years and had treated him at different times for alcoholism, and who saw him on June 3 when arrested and then examined and talked with him and found him recovering from a prolonged alcoholic debauch, to give an opinion whether he was sane or insane at that time. Witnesses for the defendant who had stated to the jury the facts upon which their opinion was based had given opinions that the defendant was insane. The doctor in like manner testified to facts and the conduct of the defendant, with his manner of answering questions at the examination on June 3 and also the next day, and it was not error to permit him to give his opinion, which was that the defendant was sane.

The revolvers and cartridges found in the stove were admitted in evidence while the People were making out their case. They were not of the same caliber as the one with which the homicide was committed and were not admitted as having connection with the crime but were prop-

erly admitted in connection with the evidence of the change of residence by the defendant, secreting himself and avoiding arrest and providing himself with the loaded revolvers, which tended to prove guilt and an understanding on his part that his act was criminal.

The defendant was examined by experts on mental diseases at the instance of the defendant and the People, and they found the pupils of his eyes unequal, and applied tests, such as bending the big toe up and stroking the bottom of the foot, testing reflexes, and the like, and these experts testified as witnesses. The expert called by the defendant was asked a hypothetical question for the purpose of obtaining his opinion that the defendant was insane. In the hypothetical question the fact of syphilis and the tests and the testimony of the witnesses as to unnatural conduct were recited, and the witness was then asked for his opinion based on such assumed facts. Objection was interposed that the question did not include material and qualifying facts proved by the defendant and undisputed, and the court sustained an objection on that ground. The other material and qualifying facts were included in the question, and the witness then gave his opinion that the defendant was insane when the shot was fired. A party is not bound to assume the existence of a fact concerning which testimony has been given if the fact is controverted and to be submitted to the jury for determination but may select such facts as he claims to exist, and the jury are to determine whether they have been proved. To require a party to submit a hypothetical question assuming facts which he does not admit but which are in dispute would compel the court to usurp the functions of the jury. (*Howard* v. *People*, 185 Ill. 552.) If the evidence is in conflict the hypothetical question may, and should, embrace only the facts tending to support the claim of the party proposing the question, but a question which fails to include all the facts as claimed and proved by the party himself would only tend

to mislead the jury by causing them to adopt an opinion without regard to the facts on which it is based. These rules are found in *Schneider* v. *Manning,* 121 Ill. 376, *Chicago and Eastern Illinois Railroad Co.* v. *Wallace,* 202 id. 129, *Fuchs* v. *Tone,* 218 id. 445, *McCarthy* v. *Spring Valley Coal Co.* 232 id. 473, and *Opp* v. *Pryor,* 294 id. 538. The trial court did not err in the ruling on the hypothetical question omitting essential facts proved by the defendant, which would necessarily enter into any opinion as to the sanity of the defendant, and this court cannot countenance any rule which would permit a jury to be misled by an omission of such facts.

At the request of the defendant the jury were instructed that one test of insanity is whether the person committing the act charged has mental capacity enough to determine right from wrong, but that a person may be able to distinguish between right and wrong and still be insane provided he is mentally incapable of choosing either to do or not to do an act charged as a crime or provided he is mentally incapable of resisting an impulse to do such an act; that if the defendant, at the time of the commission of the act in this case, was insane to such a degree that he could not distinguish right from wrong or was incapable of choosing between them or incapable of resisting an impulse to do the act, no presumption whatsoever of guilt or malice, either express or implied, or premeditation, arose from the act, and if the legal presumption of sanity had been rebutted the prosecution was bound to prove the sanity of the defendant beyond a reasonable doubt, and if the evidence was sufficient to raise a reasonable doubt of the sanity of the defendant at the time in question it was the duty of the jury to acquit him; that while drunkenness was no excuse for crime, if the act of the defendant was attributive to insanity and not to drunkenness the jury should disregard the evidence of drunkenness even though they might believe that drunkenness was a contributing cause of the

act charged, and under such circumstances they should acquit the defendant on the ground of insanity.  These rules were amplified and applied to the case by advising the jury that if they believed from the evidence that for several days prior to the shooting of Harry Reckas the defendant was suffering from delusions that he was being persecuted by yellow-cab fellows, and that such delusions were not the result of mere drunkenness but were the result of alcoholic paranoia brought on by chronic alcoholism and accompanied by the disease known as paresis, and such delusions continued down to the time of the shooting, and that at the time of the shooting the defendant was dominated by such delusions and thereby rendered mentally incapable of distinguishing right from wrong or of choosing between them, or was thereby rendered mentally incapable of exercising the power to resist some impulse to shoot Reckas, it would be their duty to acquit him.  There is no reason to complain that the law was not presented to the jury in the most favorable light for the defendant, and instructions which were refused were fully covered by those which were given.

Most of the instructions given at the request of the People are alleged to be erroneous, not because they stated rules of law incorrectly but because they were not adapted to the case.  Practically all of them stated statutory rules and it was not error to give them.  The fourth and fifth advised the jury as to the meaning of the words "malice aforethought," and the objection is that they ignored the defense of insanity.  The cases of *People* v. *Penman,* 271 Ill. 82, *People* v. *McDowell,* 284 id. 504, and *People* v. *Strause,* 290 id. 259, are relied upon as sustaining the objection.  In each of those cases the defense interposed was that the killing was done in self-defense, and while it was said that the instruction ignored that defense, it was not in the sense that it omitted to state that there was such a defense, which was not necessary and would not have been an objection, but in the sense and meaning that it nullified

the defense and was not a fair statement of the law where there was evidence tending to prove such a defense. The reason was plainly given in *People* v. *Penman, supra,* where it was said that one may intentionally kill another in self-defense and not be guilty of murder, and in such a case the deliberate and intentional use of a deadly weapon does not imply malice. One of these instructions was the same given in *People* v. *Haensel,* 293 Ill. 33, where the defense was insanity, and it was held that the instruction was not erroneous.

Instructions numbered 7 and 8 related to circumstantial evidence, and the objection is that there were no facts or circumstances about the commission of the act but it was proved by the direct and positive testimony of eye-witnesses. There were circumstances to be considered by the jury, such as the fact that the defendant immediately left the scene of the homicide and could not be found for some time and when found was apparently in hiding, and the revolvers were found, which indicated that he was capable of forming an intent; also the fact that he sent money to his mother and did business with the cigar dealer, and that his acts, aside from the hallucinations and delusions, were those of a sane man.

Instructions numbered 9, 10 and 16 related to insanity and were not incorrect. Inasmuch as sanity is the normal condition of man and insanity an abnormal state, the presumption is that all persons are sane and personally responsible for their acts, and this presumption inheres at every stage of the trial until insanity is made to appear by the evidence. (*Dacey* v. *People,* 116 Ill. 555.) Instruction 10 was correct as a definition, and instruction 16 applied the rule of law to the case.

Instructions 12 and 15 stated the rule as to voluntary intoxication, and it is admitted that they were correct statements of the law, but it is insisted they were not applicable to this case. The evidence was that the defendant began

drinking alcoholic liquor in the afternoon and was volun-
tarily intoxicated at the time of the homicide.

These are the material objections to the instructions and
there is no reason to complain of them.

As before stated, several witnesses who observed the
defendant for several days before the homicide stated facts
and gave opinions that he was insane, and the doctor who
examined him on the day of his arrest and the following
day, and had known him a great many years, gave a con-
trary opinion. The evidentiary facts having been presented
to the jury, the final conclusion of fact was for the jury
from all the evidence, with the aid of opinions of experts
as to mental disorders. The expert before referred to,
testifying on the part of the defendant, gave an opinion
that he was suffering from incipient general paresis from
syphilis; that he was dominated by delusions at the time
of the commission of the act; that drunkenness might have
aggravated pre-existing conditions and was a contributing
cause rather than an efficient and proximate cause, and that
he had so-called paranoia and was an alcoholic paranoiac.
In rebuttal the People called two experts of whom the same
hypothetical question was asked, including all the facts and
tests, and gave opinions that the defendant was sane. We
can discover no ground in the record for distinguishing be-
tween these experts as to ability or fairness, but the experts
for the People gave reasons for their opinions which were
lacking in the case of the expert for the defendant. One
of them particularly distinguished between hallucinations
and delusions, and said that true paranoia is where delu-
sions become fixed and systematized and remain for a long
time and a paranoiac stands over his victim and justifies
what he did; that he took into account the fact of the im-
mediate care the defendant took of himself in running away
after the homicide; that there was no abiding hallucination
and the hallucinations did not dominate the daily conduct of
the defendant, and that 98 per cent of the people afflicted

with syphilis are not affected mentally. All the experts recognized that if the defendant's mental condition was such that he did not distinguish right from wrong or if he was incapable of resisting an impulse to do the act he was not responsible. The defendant shot Reckas intending to kill him, and did kill him. The defense was that he was insane so that he could not distinguish between right and wrong, or committed the act under an impulse which he was incapable of resisting. He had suffered from hallucinations and delusions, nearly all of them when he was in an unusual condition by abstaining from drink, and nothing was shown tending to connect Reckas with any of them. The People were not required to demonstrate any obvious motive for the criminal act, and the conduct of the defendant after the homicide was evidence that he knew his act was forbidden by law and was wrong. Any inference that he was governed by an impulse that he was unable to resist was met by the fact that when about to shoot Fell at the same time and when the same impulse would naturally exist he yielded to Fell's reasons for desisting from the act. The experts testifying for the People reached conclusions that he was sane and gave persuasive reasons for their conclusions.

No error prejudicial to the defendant occurred on the trial and the evidence in the record sustains the verdict.

The judgment of the criminal court of Cook county is affirmed. The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of June 17, 1921, as the time when the original sentence of death entered in the criminal court shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of the county of Cook.        *Judgment affirmed.*